STATE OF NORTH CAROLINA v. RONNIE WAYNE BAKER

No. 159A92

(Filed 30 December 1994)

**1. Jury § 219 (NCI4th)— capital trial—death penalty views— refusal to return death penalty if polled—excusal for cause**

The trial court did not err in excusing a prospective juror for cause in a capital trial because of her death penalty views where the juror's responses show that if the recommendation were for death, she could not fulfill a juror's duty to state this when polled.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**2. Evidence and Witnesses § 419 (NCI4th)— identification testimony—not hypnotically refreshed**

Testimony by a witness that he was "positive" and had "no doubt whatsoever" that he saw defendant with the victim on the morning the victim was murdered did not violate the ban on hypnotically refreshed testimony and was properly admitted where the record shows that the witness positively identified defendant during pre-hypnosis interviews and that the witness's testimony referred to facts he related before his hypnotic session.

**Am Jur 2d, Evidence § 1019.**

**Admissibility of hypnotic evidence at criminal trial. 92 ALR3d 442.**

**Admissibility of hypnotically refreshed or enhanced testimony. 77 ALR4th 927.**

**3. Evidence and Witnesses § 2047 (NCI4th)— inferences based on perceptions—rebuttal testimony**

Where defendant had cross-examined a witness extensively concerning his involvement with a murder victim and his potential involvement in the victim's death, the State was entitled to have an investigating officer testify in rebuttal as to why the witness had been eliminated as a suspect. Therefore, an S.B.I. agent's testimony, in response to an inquiry as to why the witness was a suspect for only a short time, that the witness had no motive for

the murder was admissible under Rule 701 as an inference rationally based on the perception of the witness and helpful to the determination of a fact in issue. N.C.G.S. § 8C-1, Rule 701.

**Am Jur 2d, Expert and Opinion Evidence §§ 26 et seq., 362, 363.**

**4. Evidence and Witnesses § 1007 (NCI4th)— hearsay exception—unavailable declarant—sufficient finding of unavailability**

The trial court made a sufficient preliminary finding that the declarant (a murder victim) was unavailable to testify for the admission under Rule 804 of hearsay testimony by various witnesses who related statements of the victim about threats defendant made against her and her fear of him where ample evidence about the victim's death was presented by the State before the testimony of any of these witnesses; the trial court stated that the issue was "the believability of the declarant . . . [w]ho is unavailable"; and written orders admitting the testimony specified that the statements were those "of the decedent." N.C.G.S. § 8C-1, Rule 804.

**Am Jur 2d, Evidence §§ 690 et seq.**

**Residual hearsay exception where declarant unavailable: Uniform Evidence Rule 804(b)(5). 75 ALR4th 199.**

**5. Evidence and Witnesses § 1006 (NCI4th)— hearsay exception—unavailable declarant—failure to state rule number**

The trial court's omission of the rule number from its written orders admitting a murder victim's hearsay statements to certain witnesses was harmless where it is clear from the transcript and nearly identical findings and conclusions in all of the written orders that the testimony was admitted pursuant to N.C.G.S. § 8C-1, Rule 804(b)(5).

**Am Jur 2d, Evidence §§ 690 et seq.**

**Residual hearsay exception where declarant unavailable: Uniform Evidence Rule 804(b)(5). 75 ALR4th 199.**

**6. Evidence and Witnesses § 1009 (NCI4th)— hearsay statements by murder victim—circumstantial guarantees of trustworthiness—sufficient findings**

The trial court's conclusion that a murder victim's statements to six witnesses concerning defendant's threats and her fear of

STATE v. BAKER

[338 N.C. 526 (1994)]

defendant possessed circumstantial guarantees of trustworthiness was supported by the court's findings that a confidential and trusting relationship existed between the victim and five of the witnesses and that the sixth witness was a law officer acting in the performance of his duty when the victim made the statements to him.

**Am Jur 2d, Evidence §§ 690 et seq.**

**Residual hearsay exception where declarant unavailable: Uniform Evidence Rule 804(b)(5). 75 ALR4th 199.**

7. **Homicide § 237 (NCI4th)— first-degree murder—sufficiency of circumstantial evidence**

The State's evidence, although circumstantial, was sufficient to support defendant's conviction of first-degree murder of his estranged wife where it tended to show that defendant was enraged over the victim's involvement with another man; defendant uttered racial slurs against the other man, hounded, threatened, and assaulted the victim, enlisted and attempted to enlist the aid of family members in intimidating her, and told others he would kill her; defendant both had and anticipated financial difficulties, and neither robbery nor rape was a motive in the victim's death; defendant was seen with the victim on the morning of her disappearance under circumstances which permitted an inference that he was restraining her; during the interval before the victim was found, defendant suggested that one person could overcome her strength by tying her up, and medical evidence showed that the victim's ankles and wrists had been bound and something had been around her neck; during the same interval there were times in which defendant's whereabouts were unknown and a car like one to which he had access was seen on the road where the victim's body was found, an area well known to defendant and near his home; the victim was murdered in the exact way in which defendant told others he would kill her; defendant possessed a shotgun of the same type as the murder weapon; and defendant indicated by his actions on the morning when the victim was found that he had independent knowledge of the location of her body.

**Am Jur 2d, Homicide §§ 425 et seq.**

STATE v. BAKER

[338 N.C. 526 (1994)]

**8. Robbery § 55 (NCI4th)— common law robbery—sufficiency of evidence**

The State's evidence was sufficient to support the trial court's submission of an issue of defendant's guilt of common law robbery to the jury where it tended to show that the victim, defendant's estranged wife, managed a convenience store; the store's currency receipts were placed in the safe when the store was closed at the end of the day and the start-up money for the following day was concealed in the back room; on the next morning, when the victim usually arrived at the store, defendant was seen holding her outside the store; the victim was abducted from the store and later found shot to death; a deputy sheriff discovered the open safe and empty cash register; over $2500 was missing from the store, and the disappearance of the money was discovered around thirty minutes after defendant was seen with the victim outside the store; the victim left the store without her pocketbook; and circumstantial evidence tended to show that defendant killed the victim. All of the evidence supports an inference that the victim did not voluntarily part with the money belonging to the store and that it was taken concurrently with her abduction.

Am Jur 2d, Robbery §§ 62 et seq.

**9. Kidnapping and Felonious Restraint § 21 (NCI4th)— first-degree kidnapping—removal and restraint to kill victim—sufficiency of evidence**

The evidence was sufficient to support defendant's conviction for first-degree kidnapping because it supported an inference that defendant forcibly removed the victim from the convenience store she managed and restrained her for many hours for the purpose of killing her where it tended to show that defendant was seen restraining the victim outside the store within thirty minutes before here disappearance was discovered; the victim's pocketbook remained in the store and her car remained parked outside; the victim was found the next day shot to death; and after her body was discovered, an autopsy showed that her stomach was empty, her bladder was full, and her ankles, wrists and neck had been bound.

Am Jur 2d, Abduction and Kidnapping § 32.

Seizure or detention for purpose of committing rape, robbery, or similar offense as constituting separate crime of kidnapping. 43 ALR3d 699.

10. **Criminal Law § 762 (NCI4th)— instruction on reasonable doubt—use of "moral certainty" and "substantial misgiving"—no error**

The trial court did not err in its use of "moral certainty" language twice in its instruction on reasonable doubt where the remainder of the instruction lent content to the phrase, and there is no reasonable likelihood the jury understood moral certainty to be disassociated from the evidence in defendant's case. Nor was the instruction erroneous because of any combination of terms used in the definition of reasonable doubt or because it included the words "substantial misgiving."

**Am Jur 2d, Trial § 1385.**

11. **Criminal Law § 709 (NCI4th)— instructions—lapsus linguae—absence of prejudice**

The trial court's lapsus linguae in instructing the jury to return a verdict of "guilty" rather than "not guilty" if it had "a reasonable doubt as to one or more of these things" was not prejudicial error where the lapsus linguae was not called to the attention of the trial court when made; the trial court repeatedly instructed the jury that the State had the burden of proving defendant guilty beyond a reasonable doubt; the court also instructed that "[a]fter weighing all the evidence, if you are not convinced of the guilt of defendant beyond a reasonable doubt, you must find him not guilty"; and it is thus apparent from a contextual reading of the charge that the jury could not have been misled by the instruction.

**Am Jur 2d, Trial § 1127.**

12. **Criminal Law § 1355 (NCI4th)— capital sentencing—mitigating circumstance—no significant criminal history—improper submission**

The trial court erred by failing to properly submit the statutory mitigating circumstance of "no significant history of prior criminal activity" to the jury in a capital sentencing proceeding where the evidence showed that defendant's criminal record was limited to one conviction for driving while impaired and that his criminal history included threats against, and at least one assault on, the victim; the court varied the language of this statutory mitigating circumstance by submitting an issue as to whether "defendant has no record of criminal convictions," thus ignoring

evidence of defendant's uncharged crimes; although the trial court's instructions included language directing the jurors to consider whether defendant had any significant history of prior criminal activity, the jury's consideration of this circumstance was limited to defendant's criminal record when the court stated that the jury should find this circumstance if it found that defendant has one conviction of driving while impaired on his record; and the trial court's instructions erroneously permitted the jurors, if they found this circumstance to exist, to decide whether to give it weight or value.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**13. Criminal Law § 1354 (NCI4th)— capital sentencing—issues and recommendation form—statutory mitigating circumstances—mitigating value**

The trial court erred by submitting an issues and recommendation form to the jury in a capital trial which permitted the jury to determine whether the two statutory mitigating circumstances, as well as the five nonstatutory mitigating circumstances, submitted to the jury had mitigating value. If the jury finds the existence of a statutory mitigating circumstance, it may not refuse to give it weight or value.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**14. Criminal Law § 1334 (NCI4th)— capital sentencing—aggravating circumstances—denial of motion for bill of particulars**

The trial court did not err in denying defendant's motion for a bill of particulars disclosing the statutory aggravating circumstances on which the State intended to rely in seeking the death penalty.

**Am Jur 2d, Criminal Law §§ 598, 599.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Butterfield, J., at the 30 March 1992 Criminal Session of Superior Court, Wilson County, upon a jury verdict of guilty of first-degree murder. On 30 April 1992 this Court granted a stay of execution pending defendant's appeal. On 7 May 1992 this Court also granted defendant's motion to bypass the Court of Appeals as to additional judgments imposed for first-degree kidnapping and common-law robbery. Heard in the Supreme Court 15 November 1993.

STATE v. BAKER

[338 N.C. 526 (1994)]

*Attorney General Michael F. Easley, by Special Deputy Attorney General Thomas J. Ziko, for the State.*

*Thomas R. Sallenger and John E. Clark for defendant-appellant.*

PARKER, Justice.

Defendant was indicted for the murder of his estranged wife, Shirlene Baker; first-degree kidnapping; and robbery with a dangerous weapon. He was tried capitally for the murder and found guilty on the theory of premeditation and deliberation. In accordance with the jury's unanimous recommendation following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, defendant was sentenced to death. Defendant was also convicted of first-degree kidnapping, for which he was sentenced to a twelve-year term of imprisonment consecutive to his death sentence, and of common-law robbery, for which he was sentenced to a three-year term of imprisonment consecutive to the twelve-year term. For the reasons set out herein, we conclude the jury selection and guilt-innocence phases of defendant's trial were free from prejudicial error. However, on account of error in the sentencing proceeding we remand for a new capital sentencing proceeding.

State's evidence tended to show that the victim managed a convenience store on State Highway 91 near Saratoga, North Carolina. In April 1988 she and defendant were married but living apart and had two sons, Shane, who was twenty years old and married, and Ronald, who had just turned fifteen. Both sons resided with defendant. The victim opened the store for business in the mornings and usually arrived there around 5:30 a.m. She turned on the lights, made coffee, started the hot dog machine and bun warmer, and sometimes counted money received during the previous business day. The store was open from 6:00 a.m. until midnight. Several witnesses testified that the victim habitually kept the door locked until 6:00 a.m. but occasionally unlocked it for delivery men. The door had an electronic lock that the victim operated by a button near the cash register.

On Monday morning, 11 April 1988, Joey Gardner, then a uniformed officer on patrol for the Wilson County Sheriff's Department, drove by the store around 5:45 a.m. From the highway, Gardner saw the victim's automobile parked in front of the store. He observed that the lights on the coffee machine and hot dog machine inside were turned on. Gardner testified that since he saw no overt signs of a break-in, he drove on.

Minutes later A.C. Turner, a customer who regularly stopped at the store for coffee, arrived. He recognized the victim's car, went to the store door, and pushed it open. He did not see the victim but noticed the coffee machine light was on and that a light over the counter where the victim usually stood at the cash register was on. He called out to the victim but no one answered. He waited, thinking she was in the bathroom, but no one appeared. He decided to go outside and look around, and he left a bottle in the door to bypass the electronic lock. Outside, he touched the hood of the victim's car, which was warm.

About this time Jerry King, a dairy salesman, arrived to make his usual delivery to the store. Turner approached him, and the two men went in the store. Turner said he would call for help, and King left, saying he would return later to make his scheduled delivery.

Deputy Gardner testified that at 6:17 a.m. he got a radio call to return to the store. He arrived at 6:21 and found Turner, Deputy Newell, and the victim's father, Lynwood Bass, there. Gardner testified further that the men went into the store again, and he went to the back, which was like an office, and observed that a cigarette case there was unlocked. Gardner also checked the storage area, walk-in coolers, and bathrooms. He noticed there were bags on the floor behind the front counter and the door of the safe was open. The electronic cash register was open but contained no money. Interpreting all these signs to indicate a robbery, Gardner notified dispatch to call the store owner, Eddie Ellis. Gardner asked Deputy Newell to begin searching outside the store. In the meantime, around 6:30 a.m., defendant arrived at the store.

Eddie Ellis testified he arrived at the store around 6:30 a.m. In the safe he found a bank bag with the 9 April deposit, but the 10 April deposit and the change bag were missing. Altogether $2,592.10 was missing. Only he and the victim had keys to the safe; other evidence showed the victim's key was never found. There were contact alarms on the windows and doors; when employees closed up, they set the alarm system. Ellis also testified that in the cash register was a device which activated a dialing machine in the office, in turn sounding an alarm at both his house and the sheriff's office. The dialing machine was mounted inside a box which was kept locked. The condition of the cash register device showed the alarm should have sounded. However, the key to the box was hanging in the lock, and the switch inside the box was turned off. Ellis also testified that the victim had

recently given him two weeks' notice that she would be leaving, saying she intended "to make a change." On the Monday when she disappeared, she was in her final week of work.

Michael D. Austin testified that he was employed as a supervisor for Presto Food Stores and oversaw the store managed by the victim. All the employees knew about the cash register device which activated the dialing machine. All employees whose duties included locking up knew how to use the front door key to activate the contact alarm system. However, only Austin, Ellis, and the store managers knew about the dialing machines. There were two sets of keys to each box, as well as a master key retained by Austin. One set of keys was kept at each store. Policy required that the alarm boxes remain locked with the internal switches turned on. At the store managed by the victim, the keys to the dialing machine box were kept in a desk drawer with the keys to the cigarette case. Austin also testified that he knew defendant, having seen him more than once at the store with the victim. Further, whenever the victim spoke to Austin about defendant, she seemed nervous and would wring her hands. Once Austin told defendant not to telephone the store, and defendant agreed not to call. After objection by defense counsel, *voir dire*, and findings by the court, Austin was permitted to testify that the occasion on which he asked defendant not to call the store was within a month of the victim's disappearance. The victim asked Austin to intervene that day because defendant, who had been drinking, was making harassing calls to the store.

William Brice, a long-distance truck driver, who lived on the edge of Saratoga, testified that on the morning in question, around 5:15 a.m., he drove by the store on his way into Wilson to pick up a truck. Brice had known defendant for many years and knew he was married to the victim. Brice did not know the victim well but recognized her when he saw her. Approaching Highway 91, Brice came to a complete stop at a stop sign. He then made a right turn and as he approached the store, he saw a truck on the side of the road. The front of the truck was pointing in the direction of Wilson; on the back was an emblem indicating the truck was owned by Hawley. Brice did not know where defendant was employed; but other evidence showed defendant worked as a truck driver for Hawley Transport. Brice did know that he had never seen a Hawley truck there before.

Although it was dark, the outside of the store was lit up. Brice saw defendant, the victim, and a black man standing in front of the

store. Defendant was standing on the victim's left; one of his hands was holding her wrist and the other was on her upper arm or shoulder; and he had a big smile on his face. The three people looked at Brice, who sped up to avoid being obvious. Brice did not recognize the black man, who was around six feet tall. Brice continued towards Wilson and considered calling authorities. What bothered him was that defendant had his hands on the victim and the other man was standing close by. Brice decided not to approach authorities because he thought no one would believe him and he did not want to get involved. He tried to put what he had seen out of his mind. Late in the afternoon he was dispatched to Maryland. He telephoned his wife from there and found out about the victim's disappearance but still did not come forward. A few weeks later he heard some co-workers discussing the incident and mentioned the people he had seen. The first time Brice revealed his information to authorities was in October 1988, when he was sought out and questioned by Detective John Farmer of the Wilson County Sheriff's Department. When questioned by Farmer, Brice at first could not say who was outside the store and did not remember seeing the Hawley truck. Brice testified he had tried to put the incident out of his mind. Later he recalled the truck and identified the man holding onto the victim as defendant. Brice also thought he recalled seeing a van in the parking lot.

The victim's naked body was discovered on the morning of 12 April 1988. A motorist driving on a dirt road off State Highway 222 between Saratoga and Stantonsburg saw the body from the road. The area was known locally as Boswell's Store. Captain D.A. Jordan of the Wilson County Sheriff's Department arrived at the site around 8:30 a.m. and found the victim lying facedown, with her clothes at her feet but wearing shoes and socks. Jordan photographed the body and searched for evidence. The victim was wearing rings on her left hand. A ring on her right hand appeared to be a sizeable diamond, and she was wearing a watch. A necklace in the shape of a heart was near her right leg. Her clothing bore only a few drops of blood.

Jordan had also processed the safe, alarm box, and cigarette case at the store for fingerprints. No physical evidence was ever found at either site to link defendant to the crimes. In April 1988 an empty bank bag from the store was recovered, but it bore no fingerprints. Nevertheless, the distance from defendant's residence to the store was 7.9 miles, and the victim's body was found 3.3 miles from defendant's residence. The location of the bank bag was 7.7 miles from the

store, 1.9 miles from defendant's residence, and 3.1 miles from the location of the body.

Medical evidence showed that the victim died of a single gunshot wound in the early morning hours of 12 April, sometime after midnight. Dr. Thomas Hooper, who examined the body at the scene, stated that the cause of death was a close-proximity wound to the right jaw, extending into the brain stem, resulting from a shotgun blast. Dr. Hooper opined that since no blood led up to the site and the ground was soaked with blood, the victim was shot there. Moreover, the victim was unclothed when shot. The gun was probably in front of her, and she could have been either on her knees or prone, with someone lifting up her neck. Two discrete areas of marking on her neck suggested that something had been around it.

Dr. Page Hudson performed the autopsy and concurred with Dr. Hooper's assessment of the cause of death. Dr. Hudson added that the explosive force of the gunshot damaged the victim's brain stem and partially separated it and her spinal cord from her brain. The wound was undoubtedly a contact wound, since it was quite round except for stellate tears running from it. The victim would have collapsed and become unconscious immediately; she was effectively dead upon receiving the wound. Slight imprinting of the skin on the front and back of her wrists indicated they had been tied. There was also a soot or grease smear on her left wrist. Imprinting on the victim's neck appeared to be from a belt and was probably caused at the time of death. Dr. Hudson also testified that multiple fresh scratches on the victim's legs looked like typical briar scratching. In addition, fresh bruising on her left arm suggested the arm had been grabbed by a human hand. The victim's stomach was completely empty but there was a considerable amount of urine in her bladder. The materials used to bind her were relatively broad or blunt and soft because the marks left were so faint, particularly about her ankles and wrists.

Special Agent Jerry Ratley of the State Bureau of Investigation ("SBI") testified that pellets removed from the victim's body showed a twelve-gauge shotgun was used in the murder. Later, a twelve-gauge Browning shotgun was removed from defendant's home and tested for bloodstains, but none appeared. On cross-examination, Ratley testified the shotgun was recovered and tested on 25 April 1988, about two weeks after the murder. The length of time that had passed made it impossible to determine whether the gun had been recently fired.

**STATE v. BAKER**

[338 N.C. 526 (1994)]

SBI Special Agent Malcolm McLeod testified that he first interviewed defendant on 13 April 1988. Defendant said he and the victim were not living together; she was living at her mother's house. On Sunday, 10 April, the victim came by defendant's house with some videotapes for the couple's sons, Shane and Ronald, who resided with their father. Defendant told the victim he needed a ride into Wilson the next day. The victim left and went home; defendant telephoned her about 11:00 p.m. On Monday, 11 April, the victim's mother, Marlene Bass, telephoned defendant at home and told him the victim's automobile was at the store but she was missing. Defendant woke his son Shane, dressed, and rode to the store with Shane. Defendant also stated that he and the victim were having marital problems and he suspected her of seeing someone else. Defendant had confronted the victim about telephoning one Marvin Bynum. Defendant stated further that he had recorded a telephone call made by the victim and played the recording for the victim, who denied placing the call or trying to arrange any kind of rendezvous. Asked if the victim had any enemies, defendant replied that an employee of the store failed a polygraph examination and was fired. Defendant had also heard that a black man was going to the store and harassing the victim. Defendant thought the victim probably would not open the store door before 6:00 a.m. for someone she did not know. Defendant stated further that on the Saturday before Easter, the victim drove to the coast and returned on Sunday morning. He asked her if she had gone with someone, but she said she had not and had not met anyone there.

On 19 April defendant admitted to McLeod that defendant and his son Shane had followed the victim to the coast. The two men went to Atlantic Beach and rode through the parking lots of area motels. They wanted to find out if the victim met anyone on her trip. They did not see the victim's car and returned home on 2 April. On Sunday, 3 April, defendant drove to Atlanta to make a delivery. He returned home on Thursday afternoon and then drove to Atlantic Beach, where he checked into a motel. He had a fifth of whiskey, and he drank and walked on the beach. He went to bed about 11:00 p.m. The next morning, he walked on the beach again, drank, checked out of the motel, and again walked on the beach. He started to drive home and took a couple of drinks on the way. Other evidence showed that on Friday, 9 April 1988, defendant was charged with driving while impaired in Greene County; his blood alcohol content was .23; and his license was revoked for ten days. Sometime later he pleaded guilty to this charge.

Defendant also gave McLeod an account of his whereabouts on the day of the victim's disappearance, stating that he stayed at the store for a while and then returned home. He was called by a television station and gave an interview. Gilbert Sykes, the victim's brother-in-law drove defendant to the interview. Afterwards defendant waited at home with Gilbert and his wife, Brenda; Marlene Bass; Shane Baker and his wife, Michelle; and Ronald, defendant's younger son. Defendant went to bed around 11:30 p.m. The next morning, 12 April, Elizabeth Cobb either called defendant or came to his house around 8:00 a.m. and told him a body had been found on a dirt road. The family went to the dirt road and waited for Sheriff Gay to tell them if it was the victim.

On 19 April, the date of his second interview, defendant gave the officers a tape recording. He said he thought he had destroyed the tape recording of the telephone conversation between the victim and Marvin Bynum. Although defendant was not sure what was on the tape, it was later shown to be a recording of a conversation between the victim and Bynum.

Marvin Bynum testified that he lived in Wilson and was employed as a brick mason. He knew the victim because he did odd jobs for Presto Stores, including the store she managed. The victim acted very friendly towards him; the two became romantically involved about a year before her death. In addition to seeing each other at the store several times each week, they met away from the store several times and had sex once or twice. The last time Bynum saw the victim was about a week before her death; the last time he talked to her was during the weekend before her death; and he did not see her on the day of her disappearance. When interviewed on that day he denied having a relationship with her; but on Friday, 15 April, he admitted being involved and later cooperated fully with the investigating officers. During Bynum's testimony the tape recording made by defendant was played for the jury. Bynum identified the voices as those of the victim and himself. Other evidence showed the investigating officers talked to witnesses who corroborated Bynum's alibis for 11 and 12 April, and the officers eliminated him as a suspect in the victim's death.

Brenda Sykes, sister of the victim, lived in Emporia, Virginia, and had a close relationship with both victim and defendant. At the time of her sister's death, Brenda was married to Gilbert Sykes. In November 1987 Brenda became aware that her sister was having marital problems and had separated from defendant. On one occasion,

Brenda and Gilbert met defendant at a truck stop in Emporia. Defendant appeared to have lost a great deal of weight and was obsessed with the victim's seeing another man. Defendant said that if he ever caught Marvin Bynum and the victim "together, he would pile them on top of each other and kill them." Sometime during the month of November, when the Sykes family was visiting defendant's home, defendant played for Brenda and Gilbert the recorded conversation between Marvin Bynum and the victim. Defendant was very upset. Brenda testified further that the defendant and victim attempted a reconciliation and came to the Sykes' house at Christmas. Later, after the couple separated again, the victim came to visit Brenda in Emporia. The victim said she was afraid because she thought she was being followed. Brenda and Gilbert visited defendant again around Easter of 1988, when he and the victim were separated. Defendant told Brenda he and Shane had been to the beach to look for the victim. Defendant thought the victim planned to meet Marvin Bynum there.

Gilbert Sykes also testified that he had a close relationship with the defendant and victim. During the fall of 1987 the Sykes family visited in defendant's home, and defendant told Gilbert he thought the victim was seeing another man. Later defendant telephoned Gilbert in Emporia. Defendant said he had taped a call made by the victim and that she was seeing a black man. Defendant was very upset, and Gilbert and Brenda went to visit him that evening. It was on this visit that defendant played the tape; and again, he was very upset. On the same evening Gilbert and Brenda went to see the victim, who was living with her mother. The victim declined to discuss the matter. Later defendant and victim reconciled, but defendant told Gilbert he could not get over what the victim had done to him and his sons. Gilbert testified that the meeting at which defendant appeared to have lost weight took place at Sadler's truck terminal. The last conversation Gilbert had with defendant before the victim disappeared took place at Simmons' terminal in Emporia. Defendant said, "Gil, I could hire somebody for a thousand bucks to blow her away." Gilbert tried to dissuade defendant, reminding him of his two sons and grandchildren. Defendant also commented "that if he ever found Shirlene with this n——, or found for a fact that she was seeing this guy, that he would strip them down of their clothes and blow their brains out." Gilbert was frightened because he thought defendant "meant every word of it." Defendant made this statement within about three weeks of the victim's death. Later, during the Easter visit, defendant said he

and Shane had gone down to the beach to try to find the victim and find out if she was with someone. Gilbert testified defendant "said that he was well prepared, and I knew what he meant." Defendant also said he "would blow the black MF away."

SBI Special Agent William L. Thompson testified that he interviewed defendant on 19 April 1988. Defendant admitted he had told his brother-in-law that if defendant "caught his wife and the other man together, he would shoot them as they lay naked on top of each other." Defendant also said he could have told the victim "on one occasion that it was time to end it for both of them." However, defendant denied that he said he could get the victim killed for a thousand dollars.

Robert Cooke testified that he worked as a police officer from 1977 to 1984. In December of 1987 defendant engaged Cooke to follow the victim. Defendant said he believed his wife was seeing Marvin Bynum. Over the course of a month and a half, Cooke followed the victim on three occasions, twice at night and once during the day. On these occasions defendant called Cooke and told him where the victim was supposed to be. Cooke said the only thing he reported to defendant was that on one occasion the victim went out of her way to drive by Marvin Bynum's workplace but did not stop there. In addition, defendant asked Cooke about tapping the telephone at the store. Cooke said he did not know how to do this, and defendant said he had been told to get a telephone with alligator-type clips to attach to the box outside the store.

Detective James Lucas of the Wilson County Sheriff's Department testified that in late February and early March 1988 he received two telephone calls from the victim. During the first call, the victim complained of harassing telephone calls and abusive language by defendant. Lucas advised her to go to the magistrate's office. During her second conversation with Lucas, the victim was upset and crying. She said defendant had been at the store cursing, abusing, harassing, and threatening her and she was afraid of him. Lucas went to the store and saw the victim, who was "really afraid." She said defendant had been coming to the store continuously that day. He had threatened and harassed her all day. The victim was afraid to go outside the store to take out the trash and asked Lucas to check outside. Lucas did so but saw no one. He waited at the store for about thirty minutes, but defendant did not return.

After objection by defense counsel, *voir dire*, and findings by the court, several of the victim's co-workers and friends were permitted to testify about statements the victim made concerning her relationship with defendant and about his conduct towards her at work.

One such witness, Paula Lynette Bynum, testified that she worked at the same store as the victim during the spring of 1988. On Sunday, 10 April 1988, she reported to work at 4:00 p.m. She relieved the victim, who "was laughing and joking like she always do[es]." Paula Bynum's duties included closing the store. She took the money except for coins out of the cash register and put it in a bag with a cash register tape. She put the bag through the slot in the safe. She put the start-up money for the next day and a key used to remove only change from the safe in a paper bag, which she put in a trash can in the back office. She locked the cigarette case, put the key in a drawer in the office, turned out the lights, locked the door, and left, taking her door key with her. Paula Bynum did not remember how much money she put in the safe; it was the victim's job to make a report on this the next day. Paula Bynum did not have a key to the safe or the dialing machine box; she testified there were no keys in the box when she left that evening. Paula Bynum also testified that the victim confided in her that the victim and defendant were separated and the victim was living with her mother. When defendant got drunk, "he would slap her around." The victim told Paula Bynum she was going with a man, and defendant said if he caught the victim with the man, defendant would kill her. Defendant said he would rather see the victim dead than with a black man. In April, defendant came into the store, and the victim said, "[O]h, s---[,] [h]ere come[s] Ronnie." The victim went up to the defendant and asked him to repay her some money that she had given her son for spring break. Defendant "pushed her back and they started arguing." Paula Bynum went to the back of the store, and defendant eventually left. Paula Bynum also testified that one night a truck came into the store parking lot, drove along the side of the store, and slowed down. Because she was afraid someone was planning to rob the store, Paula Bynum told the victim, who said it was her friend Marvin Bynum. The victim went outside to the telephone booth to call Marvin Bynum because she said defendant had bugged the store telephone and her home telephone. She told Paula Bynum not to tell defendant about the victim's work schedule.

Several witnesses for the State testified as to defendant's whereabouts and actions on 11 April and the day after, when the victim's body was found. Gilbert Sykes testified that since defendant could

not drive, Gilbert "chauffeured him around that morning, that after-noon." Gilbert testified, "Ronnie had wanted me to take him up town to go, I believe it was his phone bill." Gilbert took defendant to the telephone company on Nash Street, and they also stopped at a little shopping center, where defendant bought something but Gilbert did not know what. After returning to defendant's house, the two went back to the store around 5:30 p.m., in order to meet with a television crew. Defendant was nervous and asked Gilbert what he should say. Gilbert said, "You need to tell from your own feelings what you feel and let whoever's got Shirl, let them know that they needed to turn her loose." Gilbert said a few more similar things and was puzzled when the words defendant spoke for the interview "were almost [the] identical words that I had said to him going to the store."

Elizabeth Butts, a hairdresser, had known the victim for over twenty years, remembered defendant from school, and knew the couple dated in high school. Around the time of the murder, Butts usually cut both the victim's and defendant's hair. Butts thought defendant acted very possessive of the victim. On several occasions when Butts was cutting the victim's hair, defendant either came to the shop or called and asked how much longer the victim would be there. Butts testified that the place where the victim's body was found was a local lovers' lane. Butts had seen the defendant and victim together there when they were dating. Moreover, defendant at one time lived across the road from the area.

Around lunchtime on 11 April 1988, Butts went to defendant's house. There were many people there, and Butts was not sure if defendant was there when she arrived. She testified, "There was a lot of leaving and coming back." Sometimes defendant left the house when others did. On one occasion, defendant and "several guys left, and he grabbed a shotgun off the foyer wall." Butts did not remember seeing anyone return the shotgun. On another occasion, Butts and defendant discussed what might have happened. Defendant said he could not believe anyone would kidnap his wife. Butts said, "[I]t had to have been more than one person because one person couldn't have held Shirl. She was too strong." Defendant replied, "[W]ell, they could always [have] tied her up with duct tape or ropes or masking tape," and added, "could always have put her in the trunk of a car." Defendant smoked numerous cigarettes, and Butts could not recall ever having seen him smoke before that moment. Sometime after Brenda and Gilbert Sykes arrived, Brenda threw her car keys to defendant. Apparently the Sykes' car was blocking someone who wanted to leave.

Butts could not remember if defendant returned to the house after taking the keys. Butts stayed to watch the 11:00 p.m. news and left around midnight. Sometime late in the evening defendant left the house, saying he was going to make a telephone call and did not want to use his home telephone. Defendant did not want his telephone tied up because earlier he and someone else had gone to get a tap put on the telephone. Again, Butts could not recall when defendant returned or if he came back by the time she left.

The next morning Butts went to defendant's house around 8:00 a.m., after she drove her younger son to school. She drove up the steep driveway, put on the emergency brake, and turned off the engine. She did not think anyone in the house was awake. She tapped on the side door, but no one answered. She started back to her car and was backing down the drive when she looked up and saw defendant. He had pulled a curtain back and was looking out the dining room window. He was not wearing a shirt. Butts went back; defendant opened the kitchen door for her; and she asked if she had awakened the family. She asked if the family was hungry and wanted her to get some biscuits for them. About that time, the telephone rang, and defendant answered. He said, "[T]hey found Shirlene at Boswell's Store. Let's go." He told Butts the caller was "Lois"; and Butts assumed he meant Lois Bass, the sister-in-law of the victim's father. Defendant asked Butts to take Shane's wife and children in Butts' car. Defendant and his sons rode together, and the two parties drove to the site where the victim's body was discovered. Butts testified further that she did not know when she arrived at defendant's house that a body had been discovered.

Sheriff Wayne Gay testified that about 7:50 a.m. on 12 April, he received a telephone call from defendant, who wanted to know if there was any more information about his wife's disappearance. Sheriff Gay talked for a few minutes about the investigation but was interrupted by a radio communication that a body had been located. Defendant inquired if it was his wife. Sheriff Gay replied that he did not know yet and did not know exactly where the body was; he knew only that a body was found somewhere in the Stantonsburg community. He testified, "I informed Mr. Baker, at that time, that I would get back with him just as soon as we had some details concerning the information on the body." He did not give defendant any road or route numbers. In addition, "I did tell [defendant] it was a body of a female that had been found but did not tell him whether it was white or black." Further, Sheriff Gay did not mention Boswell's Store and did

not know the body was there until he went with other officers to the scene. Nevertheless, within thirty minutes a deputy informed the sheriff that defendant was at the scene. The sheriff spoke to defendant, his children, and the victim's mother and told them the body was that of Shirlene Baker. Defendant asked if his wife was dead and how she had been killed. Defendant asked how she was dressed, the sheriff said she was naked, and defendant asked if she had been raped.

Lois Bass testified that she did not telephone defendant on the morning of 12 April. However, she had a scanner and was listening to it that morning when the victim's body was discovered.

Willie Newsome testified that he lived near Haywood, between Saratoga and Stantonsburg. On the night of 11 April 1988 he stopped at a friend's house on a dirt road that was called lovers' lane. It was around 8:00 p.m. and dark; his car headlights were turned on. He saw a car turn off State Highway 222, drive just a little ways onto the dirt road, and stop. Newsome waited, thinking it was someone who wanted to ask him about his tobacco patch. He waited about twenty minutes to see if someone wanted his help. The car was either light blue or green and very dusty; it was a big car with four doors. Newsome testified it had pretty spokes, with the "fanciest looking rims on it." Newsome had never seen the car before. The driver appeared to be in his forties; he had a beard. His arm was lying over something that looked like a bale of cotton or a fertilizer bag.

Newsome was interviewed by Detective John Farmer on 12 April 1988, the day after Newsome saw the car. On 12 May 1988, Farmer showed Newsome an array of seven photographs, and Newsome selected a photograph of defendant as resembling the man driving the car on the dirt road. Nevertheless, when shown the same photographs at trial, Newsome first selected a photograph of Captain D.A. Jordan of the Wilson Police Department, then selected a photograph of defendant, and finally selected one of someone known to Farmer only as "Watson."

Brenda Finch, a branch manager for Blazer Financial Services, testified that she knew both defendant and victim because they had an account with Blazer. In December 1987 the couple applied for a home equity loan to consolidate some of their bills. Finch testified, "The application was denied for excessive obligations[,] which means they had more going out than they had coming in." Around the first week of January Finch told defendant about the denial, and he said, "I guess, damn it, I'll just file [for] bankruptcy." Defendant was upset

that his loan application was denied. In Finch's opinion, defendant could not have met his financial obligations without the victim's salary, nor could the victim have met the obligations without defendant's salary.

In addition to the testimony described hereinabove, Gilbert Sykes testified that he sold insurance, and defendant "bought [$]50 thousand on Shirl, as well as his own self." Each spouse was the beneficiary of the policy on the other's life. Defendant received the insurance money after the victim's death. After defendant received the money, Gilbert himself had serious financial difficulties, borrowed money from the victim's mother and from the defendant, and ended by declaring bankruptcy. By the time of trial, he was divorced from the victim's sister.

At the close of State's evidence, defendant moved to dismiss the charges against him. After hearing arguments, the trial court denied the motion and ruled that the case would go forward on the charges of first-degree murder, kidnapping, and common-law robbery instead of armed robbery.

Defendant's evidence included testimony from his sons and daughter-in-law, Michelle Baker. Shane corroborated his father's statement about the victim's visit to his house on the Sunday evening before she disappeared. Shane testified that his mother called defendant that night around 9:45 p.m. To Shane's knowledge, his father did not leave the house that night or the next morning. Around 6:45 a.m. on 11 April, Marlene Bass, Shane's grandmother, telephoned and said the victim was missing from the store. Defendant told his son Ronald he should go to school, and defendant reset the alarm clock in case Ronald fell asleep again. Defendant and Shane dressed and left to go to the store; Shane drove. Later in the morning Shane went to Ronald's school and brought him home. Shane also testified that as the day passed, defendant's house and yard filled up with people. Shane recalled special instructions about using the telephone, keeping the line free, and not hanging up if someone called with a ransom demand. He also testified that someone called that night, and defendant said he was going across the street to make a telephone call. Defendant left but returned within ten minutes and did not leave the house again that night. Eventually the guests left, and the family went to bed around midnight. The house had two bedrooms. Shane, his wife, and their two children slept together in a water bed in a bedroom customarily used by Ronald. Ronald and defendant slept

together in a bed in the master bedroom. To the best of Shane's knowledge, neither defendant nor anyone else left the house after the family went to bed.

Shane testified further that around 8:00 a.m. on 12 April, someone knocked on the door of the house. Shane's wife got up, and Shane was putting on his clothes. Elizabeth Butts was at the door; she said she heard on a scanner that a body had been found on a dirt road between Stantonsburg and Saratoga. Within moments of Butts' entering the house, the telephone rang, and defendant answered it. The family finished dressing; and defendant, Shane, and Ronald left in one car. Butts and Shane's wife and children rode in Butts' car. Between 8:15 and 8:30 a.m., they arrived at the end of the dirt road, but a deputy was blocking it. Soon the sheriff came, talked to them, and told them there was nothing they could do. After that, they returned home.

However, on cross-examination, Shane admitted that his father could have left the house on the evening of 11 April without Shane's knowledge. In addition, Shane at first testified that his family did not have a scanner but later said A.C. Hendricks had brought one to their house on Monday. Further, in a statement made on 26 April 1988, Shane did not mention that Butts told the family a body had been found. In a statement made in August 1989, Shane said for the first time that Butts was the source of the information. In addition, on cross-examination Shane said his father came into the kitchen and said the victim was found on a dirt road. Further, Shane did not hear defendant telephone the sheriff on the morning of 12 April 1988.

On direct examination Shane also described an occasion before Christmas 1987 when defendant played the recording of the victim's conversation with Marvin Bynum. Shane and his mother were sitting in the living room at defendant's house, and defendant came in with the tape and started playing it. The victim left and went into the bedroom, Shane followed her and tried to talk to her, and the victim refused to discuss the matter. This was not the first time Shane had heard the recording. Defendant walked into the bedroom, and the victim picked up a candle holder and threw it at the defendant. Shortly afterwards, the victim left. Defendant did not threaten the victim, but he was upset. After this incident defendant and victim attempted to reconcile their differences, and the family went to Virginia at Christmas. Shane also testified that even during times when his parents were separated, the victim would stay with her younger son if defendant was on the road.

STATE v. BAKER

[338 N.C. 526 (1994)]

On cross-examination Shane testified that the victim was not afraid of defendant. Shane knew that defendant was following the victim or having her followed and that defendant put a tap on his home telephone. Shane also testified that his father would get drunk on weekends but usually passed out on the sofa at home. On redirect-examination Shane testified that he had never seen defendant strike or hit the victim. In addition, Shane did not sign any statements he made to officers during the investigation.

Ronald Baker testified that he was aware that his parents were having marital difficulties. Defendant played the recorded conversation and asked Ronald whom he thought the victim was talking to. Ronald recognized the male voice as that of Marvin Bynum, whom he had seen at the store where his grandmother worked. In addition, Ronald was at home on the night when Shane and the victim were talking and defendant played the tape again. Ronald was not in the room with Shane and the victim; Ronald was upset by the recording. Ronald generally corroborated other testimony about his parents' separation and attempted reconciliation, Christmas trip to Virginia, and subsequent separation. On Sunday, 10 April, Ronald drove with some friends to Raleigh. They returned after dark and stopped at Winn Dixie at Parkwood Plaza, where Ronald saw his mother. She said she had just come from Rose's and intended to buy some steaks at the grocery store. Ronald returned to defendant's house around 10:00 p.m.; defendant was watching a videotape and said the victim had brought it by. Ronald went to bed and did not hear anyone get up in the night.

He was awakened on the morning of 11 April by defendant's speaking on the telephone. Defendant told Ronald that the victim was missing from the store, Ronald could not do anything at the store, and Ronald should go to school. Ronald testified further that Shane brought him home from school and many people came to the house during the day. Ronald recalled seeing defendant leave with Gilbert for a television interview but could not recall defendant's leaving at any other time. In the evening Ronald mostly stayed on the water bed in his bedroom. He went to bed in defendant's bedroom around midnight and did not think anyone left the house after that. Ronald did not know whether Butts knocked on the door on the morning of 12 April. He testified that he was awakened by defendant's telling him a body had been found and then went with defendant to the dirt road.

On cross-examination Ronald said that on one occasion he went with defendant to the store where the victim worked. Defendant got a recording device out of the office and took it home. Ronald tried to help defendant connect the device, which came from Radio Shack, to the telephone in Ronald's room. Defendant said, "I just want to find out who [sic] your mama's talking to." Ronald also testified that defendant drank but, as Shane had said, would fall asleep on the sofa or chair. In addition, Gilbert Sykes had a dark blue, four-door automobile with spoked wheels.

Michelle Baker testified that she and Shane were married 7 December 1984 and divorced 20 April 1989. They lived with Shane's parents for about a year and a half, moved out on their own, moved in again with Shane's parents, and then moved out again. She and Shane separated around June of 1987, Michelle went to live in Green Briar trailer park, and Shane moved back in with his parents. At the time of the trial, their daughter Lauren was six years old, and daughter Ashley was five years old. Michelle knew the layout of defendant's house well and also described the driveway, which was extremely narrow and steep. She and Shane usually parked their car in the backyard.

Around 5:00 p.m. on Monday, 11 April, Michelle went to pick up her daughters at her mother's house. Her mother told her the victim was missing, and Michelle went directly to defendant's house to be with Shane, even though they were separated. She arrived there between 5:30 and 6:00 p.m., and defendant had just returned from a television interview at the store. Many friends and neighbors were at the house, some standing out in the yard and others inside the house. During that evening Michelle saw defendant leave the house once, around 8:15. He left with Gilbert Sykes to get a pack of cigarettes; the two were gone about fifteen minutes. She heard defendant say not to tie up the telephone; but if it rang and no one spoke, not to hang up. She understood the telephone was tapped to find out where incoming calls were coming from. Around 9:30, the telephone rang, she answered, and no one spoke. She said aloud, "They won't talk to me." Defendant said, "Don't hang the phone up. I have to go across the street." Michelle did not actually see defendant leave the house, but he returned within seven minutes. Around 10:00, people began to leave; and by midnight, the only people at the house were defendant, Ronald, Shane, Michelle, and her daughters, whom Michelle's mother had brought over sometime that evening. Michelle was sitting in the den, looked out the window, and saw a car stop directly in front of the

house. Defendant told everyone to stay inside; and he and Shane went out, but the car turned in the driveway of the house across the street and then sped away. After this, the family went to bed; and Shane and Michelle got into the water bed in Ronald's room, where their two daughters had already fallen asleep. The room was over the driveway; cars could not get through to the backyard unless they passed directly under the bedroom window. Michelle had difficulty going to sleep; she remembered looking at the clock for the last time at 4:05 a.m. She did not hear anyone leave the house that night.

The next thing she heard was a knock on the side door. She was already dressed and got up to answer the door. When she opened the door, Elizabeth Butts stepped inside, and the telephone rang. Defendant said, "I got it." Butts said something about breakfast, and Michelle went back to the bedroom to help her daughters dress. She heard the telephone in defendant's room hit the marble top of a bedside table. Defendant came through the house and said, "They found my Shirl. We got to go." Michelle and her daughters rode with Elizabeth Butts, and they did not stop at the dirt road. Instead, Butts drove to her house because she had a scanner and thought they could learn more there than from standing on the road. At Butts' house, Michelle called her mother and then she returned to defendant's house. Sometime in mid-afternoon, Michelle, Shane, and some others went back to the site where the victim's body had been found.

Michelle also testified that she suspected the victim had been cheating on defendant. Michelle had observed that sometimes defendant would drink and pass out; and the victim would get in her car, say she would be back in a little while, and would stay gone for up to one and one-half hours. Michelle had never seen defendant become violent towards the victim. Once Michelle saw the victim go after the defendant with a poker because he was trying to open the fireplace and burn the room.

On cross-examination Michelle was confronted with a statement she made on 10 August 1988, in which she said that during the evening of 11 April 1988, she left defendant's house on two occasions, once for about ten minutes, when she went to the grocery store, and again for about an hour, when she took one of her daughters somewhere. Michelle denied having made the statement. She reiterated that around 8:00 that night, she saw defendant leave with Gilbert Sykes. In addition, she did not watch him as he left to check on the telephone call or as he returned, but she knew he came back. Further,

when Elizabeth Butts came to the door on the morning of 12 April, she did not say anything about a body. Instead, Butts said, "I brought breakfast." In addition, in contrast to Shane's testimony, Michelle did not remember his having asked defendant where the victim's body was found or defendant's having answered that it was down the dirt road to the right going into Saratoga. Moreover, she did not recall saying on 5 March 1992 that Shane asked the question and defendant gave the answer testified to by Shane. Further, she did not hear anyone make a telephone call from the house that morning. Confronted again with her 10 August 1988 statement, in which she also said she felt like defendant had killed the victim, Michelle again denied making the statement.

State's rebuttal evidence included the testimony of Elizabeth Butts that on the morning of 12 April, when she saw defendant standing in the window of the kitchen-dining room, she got back out of her car and returned to the door. Defendant, not Michelle, opened the door for her. Butts did not really give defendant a chance to speak; she began to say she had not wanted to wake the family. She told defendant she came by to see if they wanted her to go to a convenience store and get them some biscuits. She did not have any food with her, having just driven her son to school. Although she constantly listened to a scanner at home, she had not heard anything about the discovery of a body. She was sure of this because she learned later that her elder son, who was sick and at home, heard the news on the scanner. When Butts returned home with Michelle and her daughters, Butts' son told Butts that he thought about calling her at defendant's house, knowing that she was on the way there and did not know about the body. Butts reiterated that she did not tell anyone in defendant's household about the discovery of a body because she did not know it herself. The first time she learned about it was at defendant's house, where the telephone rang within moments of her arrival. Butts had been talking to Shane and was talking to Michelle when defendant said, "They found, Shirl's—at Boswell's Store. Let's go." Butts asked defendant who had telephoned and testified, "[H]e said Lois." Asked whether defendant gave any directions, Butts testified, "That's all I knew. What he said. Which I knew where Boswell Store was." On redirect, Butts clarified that from defendant's words, she thought the victim was still alive. In addition, Michelle first spoke to Butts when Michelle came out of the bedroom door.

Detective Farmer testified that in Michelle's 10 August 1988 statement,

STATE v. BAKER

[338 N.C. 526 (1994)]

Michelle stated Elizabeth Butts was at [defendant's] Tuesday morning when the telephone rang, and [defendant] said he would get it.

She said that [defendant] answered it in another room and said that Shirlene has been found.

Michelle said that [defendant] had been awake and was dressed when the telephone rang.

Michelle did not mention opening the door for Butts or say Butts informed the family that a body had been found. Moreover, in her statement made 5 March 1992, Michelle said that defendant "was drinking; was drunk and made a statement that if Shirlene was seeing the n———, that he ought to kill her." Also in that statement Michelle said that on the morning of 12 April, the telephone rang and defendant answered it. She heard the telephone hit the table, and defendant came out and stated, "They found my Shirl." As the family went out the door, Shane asked where, and defendant replied that she was found down the dirt road on the right, going to Saratoga, in the bend. Again, Michelle did not mention opening the door for Butts or that Butts told the family a body had been found.

At the close of all the evidence defendant renewed his motion to dismiss the charges against him. The trial court denied the motion.

JURY SELECTION

[1] Defendant's sole contention is that excusal of a prospective juror for cause violated the standard articulated in *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985). We disagree.

In capital cases, venirepersons who express opposition to the death penalty may be removed for cause if their opposition would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oaths. *Id.* at 424, 83 L. Ed. 2d at 851-52. Where a person's responses to questions indicate he does not believe in the death penalty and this belief would interfere with the performance of his duty at the guilt-innocence phase or sentencing proceeding, such responses show that he cannot fulfill the obligations of a juror's oath to follow the law in carrying out his duties as a juror; and the trial court does not err in excusing him for cause. *State v. Syriani*, 333 N.C. 350, 371, 428 S.E.2d 118, 129, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994).

In the instant case, prospective juror Reid was questioned extensively by the prosecutor, trial court, and defense counsel. In answer to the prosecutor's questions, she first said she had no moral or religious beliefs against the death penalty but later said she could not return a death sentence recommendation. Finally she said she would vote against death, no matter the facts or circumstances. Upon State's challenge for cause, the trial court questioned Reid, who first said she could set aside her own personal feelings and vote for death but later said her conscience would not permit her to stand up in open court and announce her verdict before all concerned. The court noted for the record that Reid was "struggling with these questions and at this moment she is tearful and she is also pregnant."

Defense counsel argued that Reid seemed perfectly qualified to decide the issue of guilt or innocence but because she

> has not been entirely death qualified to satisfy the State[,] she has to be excused for cause when she has certainly stated that she could answer the question of guilt or innocence without any reservation at all. She could go in the back room and make the decisions that were necessary and though she may not agree with the law, she would follow the law. Yet she would not want to be exposed to the situation of having to come into the courtroom and face the Court and face the Defendant and make an overture that would be inconsistent with her conscience but not inconsistent with her guidance in regard to the law. That's saying to me that we've got to have death qualified jurors that are conviction prone in all cases and that if we sit here as people that do not believe in the death penalty, we're going to be having a Defendant tried by death qualified jurors not being qualified at all to be tried by his own peers, that it seems totally unfair to me and he has a right to be so tried[,] I think[,] and that the argument that I make is nothing new to you but this lady has been the best example I've seen of someone that will follow the law completely, doesn't like the law, but is qualified to serve, yet though she doesn't want to espouse a cause that she doesn't believe in, we have to excuse her and I just don't think it's right. I don't think the law is intended to be that way and I seriously object to her being excuse[d].

After listening to this argument, the trial court observed "that *a part of the juror's duty and oath is to submit to polling after a sentence recommendation has been made and if the juror is unwilling to submit herself to be polled, then that would be a violation of her*

*duty and a violation of her oath and would also disqualify her from
service.*" (Emphasis added.) Defense counsel argued further that Reid
had equivocated but had been sufficiently rehabilitated under
*Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968), and
*Davis v. Georgia*, 429 U.S. 122, 50 L. Ed. 2d 339 (1976). The trial court
then found and concluded that Reid's views would prevent or sub-
stantially impair the performance of her duty as a juror in accordance
with the court's instructions and her oath and granted State's chal-
lenge for cause.

The arguments and responses quoted above show that this issue
was examined carefully and resolved correctly by the trial court.
Since Reid's responses showed that if the recommendation were for
death, she could not fulfill a juror's duty to state this when polled, we
hold the trial court did not err in granting State's challenge for cause
and excusing her.

GUILT-INNOCENCE PHASE

[2] Defendant first contends the trial court committed reversible
error by allowing William Brice to testify that at the time of trial he
was "positive" and had "no doubt whatsoever" that on the morning of
11 April he saw defendant with the victim. Defendant argues the tes-
timony deprived him of his federal and state constitutional rights. On
20 March 1992 defendant moved *in limine* to preclude Brice from tes-
tifying as to facts related and/or remembered since undergoing hyp-
nosis on 13 January 1989. The record shows that at trial the court was
aware of a pretrial order prohibiting Brice from testifying as to state-
ments made after hypnosis. In addition, Assistant District Attorney
Josephs stated that he understood nothing Brice revealed after hyp-
nosis was admissible. Brice testified that in his first conversation
with authorities he described seeing only a white man, a black man,
and the victim. In his second conversation he said he thought defend-
ant was there. Further, only after thinking about it extensively, did
Brice say he was positive that he saw defendant. Josephs asked, "Is
there any doubt in your mind that's who you saw there that morning?"
and "Are you positive now?" Defendant argues these questions vio-
lated the ban on hypnotically refreshed testimony. We do not find
defendant's arguments persuasive.

"[H]ypnotically refreshed testimony is inadmissible in judicial
proceedings." *State v. Peoples*, 311 N.C. 515, 533, 319 S.E.2d 177, 188
(1984). Notwithstanding this rule of inadmissibility, not all testimony
of a previously hypnotized witness is barred. Such a witness may tes-

tify "as to facts which he related before the hypnotic session." *State v. Annadale*, 329 N.C. 557, 570, 406 S.E.2d 837, 845 (1991).

"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and [if] the ruling is one admitting evidence, a timely objection or motion to strike appears of record." N.C.G.S. § 8C-1, Rule 103(a)(1) (1992). "In criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule or law without any such action, nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(c)(4).

In the instant case, the record shows defendant did not object at trial, but before this Court defendant does not argue plain error. The record shows further that during pre-hypnosis interviews, Brice positively identified defendant. Since Brice's answers referred to facts he related before his hypnotic session, the trial court did not err in admitting the testimony. Since there was no error, there could be no plain error. *State v. Torain*, 316 N.C. 111, 123, 340 S.E.2d 465, 468, *cert. denied*, 479 U.S. 836, 93 L. Ed. 2d 77 (1986). Therefore, we overrule this assignment of error.

[3] Defendant's next contention is that the trial court erred in permitting Agent Ratley to opine that Marvin Bynum had no motive for the murder. Again we disagree.

Ratley's testimony was as follows:

Q. Was Marvin Bynum ever a suspect?

A. For a short period of time, yes, sir, he was.

Q. Why was he [a] suspect only for a short period of time?

A. He was a suspect to such time that we could run out the story that he had given us of the alibi he established for himself, and determined to ourselves that he had no motive for the murder.

Mr. Martin: Well—

Q. This alibi?

Mr. Martin: Objection to the conclusion, Your Honor.

Motion to strike.

THE COURT: Overruled.

Q. This alibi, was that checked out?

A. Yes, sir, it was.

Q. Did it check out?

A. Yes, sir. From both Monday and Tuesday morning, the stories he had given us were corroborated by other witnesses.

Defendant argues that Agent Ratley's testimony that Marvin Bynum had no motive for the murder was not permissible opinion testimony by a lay witness under N.C.G.S. § 8C-1, Rule 701. Agent Ratley made this statement as part of his answer to a specific inquiry as to why Marvin Bynum was a suspect for only a short period of time. Assuming that the objected-to statement was an opinion or inference, we conclude the statement was admissible under Rule 701 as an inference "(a) rationally based on the perception of the witness and (b) helpful to . . . the determination of a fact in issue." N.C.G.S. § 8C-1, Rule 701 (1992).

Defendant had cross-examined Marvin Bynum extensively concerning his involvement with the victim and his potential involvement in the victim's death. Under these circumstances the State was entitled to have an investigating officer testify in rebuttal as to why Marvin Bynum had been eliminated as a suspect. The evidence was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court did not abuse its discretion in admitting the evidence. This assignment of error is overruled.

[4] Defendant next contends the trial court erred in admitting the testimony of witnesses—Sherill Denise Edwards, Rita Cooper, James Lucas, Paula Bynum, and Carol Farmer—who related statements of the victim about threats defendant made against her and her fear of him. Defendant first argues that the trial court erred in admitting the testimony under N.C.G.S. § 8C-1, Rule 804, because the court failed to make a preliminary finding that the declarant, the victim, was unavailable to testify. We disagree.

Certain hearsay statements are recognized as exceptions to the general hearsay ban if the declarant is unavailable to testify in court. N.C.G.S. § 8C-1, Rule 804 (1992). "Unavailability" exists where the declarant is dead. *Id.* Rule 804(a)(4). This Court has said that if the declarant is dead, the trial court's determination of unavailability

"must be supported by a finding that the declarant is dead, which finding in turn must be supported by evidence of death." *State v. Triplett*, 316 N.C. 1, 8, 340 S.E.2d 736, 740 (1986).

In the instant case, State's witnesses Captain D.A. Jordan and Dr. Thomas Hooper both testified that on 12 April 1988 the victim was dead. Immediately after Hooper's testimony, the State presented the testimony of Dr. Page Hudson, who performed the autopsy on the victim's body. All this evidence was admitted before the testimony of any witness now challenged by defendant. Hence, there was ample evidence of death to support the finding required by *Triplett*. Moreover, the first time the State attempted to introduce hearsay statements of the victim was through the testimony of Marvin Bynum, who did not testify until after Jordan, Hooper, and Hudson. While considering defense counsel's arguments against admitting the hearsay, the court stated that the issue was "the believability of the declarant . . . [w]ho is unavailable." Moreover, in the written order excluding the hearsay testimony of Marvin Bynum and in the orders admitting the hearsay testimony of Edwards, Cooper, Dew, Lucas, Paula Bynum, and Farmer, the trial court specified that the statements were those "of the decedent." Since the record shows the trial court did not fail to make the finding required by *Triplett*, we conclude the trial court did not err.

[5]  Defendant also argues that the trial court erred in not specifying which exception governed admissibility of the testimony of Edwards, Cooper, Dew, Paula Bynum, and Farmer. Defendant concedes that the transcript clearly indicates Lucas' testimony was admitted under the Rule 804(b)(5) exception and that the record includes individual written orders admitting all the witnesses' testimony. Moreover, we find that the written order excluding the victim's statements to Marvin Bynum states, "The proffered statements do not possess equivalent circumstantial guarantees of trustworthiness as required by Rule 804(B)(4) [sic] of the Rules of Evidence." The better practice would have been for the trial court to specify in the other orders that the evidence was admissible under Rule 804(b)(5). However, from the transcript and the nearly identical findings and conclusions in all the written orders in the record, it is clear that the hearsay testimony admitted by the court was admitted pursuant to Rule 804(b)(5). Therefore, omission of the rule number from the orders admitting the testimony was harmless. *Cf. State v. Smith*, 315 N.C. 76, 97, 337 S.E.2d 833, 847 (1985) (holding that before admitting Rule 803(24)

STATE v. BAKER

[338 N.C. 526 (1994)]

hearsay statements, the trial court must enter in the record appropriate statements, rationale, or findings of fact and conclusions of law).

**[6]** Defendant argues further that there was insufficient evidence to allow the trial court to find and conclude that the victim's statements were worthy of belief. Again, we disagree.

In weighing the circumstantial guarantees of trustworthiness of a hearsay statement for purposes of Rule 804(b)(5), the trial judge must consider such factors as (i) assurances of the declarant's personal knowledge of the underlying events, (ii) the declarant's motivation to speak the truth, (iii) whether the declarant ever recanted the statement, and (iv) nature and character of the statement and relationship of the parties. *Triplett*, 316 N.C. at 10-11, 340 S.E.2d at 742. Where the declarant and witness enjoy a close friendship, the declarant is very likely to be honest in her statements. *Id.* at 11, 340 S.E.2d at 742. Further, *Triplett* teaches that a victim-declarant's statements to a law enforcement officer describing (i) ill will between the defendant and herself and fear of the defendant and (ii) prior attacks by the defendant and the victim's fear are likely to possess the required guarantees. 316 N.C. at 12, 340 S.E.2d at 743.

In the instant case the record shows the challenged hearsay statements concerned defendant's threats and the victim's fear. The trial court found that a confidential and trusting relationship existed between the victim and Edwards, Cooper, Dew, Paula Bynum, and Farmer. The court found further that when the victim made statements to Lucas, he was a law enforcement officer acting in the performance of his duty. Under *Triplett*, these findings were adequate to support the court's conclusions that the statements possessed circumstantial guarantees of trustworthiness. Therefore, we conclude the trial court did not err.

**[7]** Defendant's next contention is that the trial court erred in denying his motion to dismiss the charge of first-degree murder made at the close of State's evidence and renewed at the close of all the evidence. Defendant concedes the evidence showed that the victim died by virtue of a criminal act but argues the evidence was insufficient to show that defendant committed that act. We do not find defendant's argument persuasive.

Recently the Court reiterated the standard of review applicable to defendant's contention. We said as follows:

The law regarding denials of motions to dismiss in criminal trials is well settled. This Court reviewed the law in *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980):

> Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.

> If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion should be allowed.

*Id.* at 98, 261 S.E.2d at 117 (citations omitted). In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. *Id.* The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984). "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then " 'it is for the jury to decide whether the facts, *taken singly or in combination*, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.' " *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (alteration in original) (quoting *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965)).

*State v. Barnes*, 334 N.C. 67, 75-76, 430 S.E.2d 914, 918-19 (1993); *see also State v. Triplett*, 316 N.C. 1, 6, 340 S.E.2d 736, 739 (stating that to withstand motion to dismiss, evidence need not be inconsistent with every reasonable hypothesis of innocence). In addition, the trial court is to consider all evidence actually admitted, competent or incompetent, which is favorable to the State, disregarding defendant's evi-

dence unless favorable to the State. If not in conflict with State's evidence, defendant's evidence "may be used to explain or clarify the evidence offered by the State." *State v. Earnhardt,* 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982).

In *State v. Bryant,* 334 N.C. 333, 432 S.E.2d 291 (1993), *judgment vacated,* ⸺ U.S. ⸺, 128 L. Ed. 2d 42, *on remand,* 337 N.C. 298, 446 S.E.2d 71 (1994), the defendant did not contend the evidence was insufficient to prove any specific element of the offense of first-degree murder. The Court reemphasized that

> [w]here there is substantial evidence of each element of the offense charged—as here—the fact that there was "scant" physical evidence, or inconsistencies in the evidence, is for the jury's consideration. *See State v. Earnhardt,* 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982). In addition, "the credibility of the witness' identification and the weight given his testimony is a matter for the jury to decide." *State v. Turner,* 305 N.C. 356, 362, 289 S.E.2d 368, 372 (citing *State v. Green,* 296 N.C. 183, 250 S.E.2d 197 (1978)); *State v. Orr,* 260 N.C. 177, 132 S.E.2d 334 (1963); *State v. Bowerman,* 232 N.C. 374, 61 S.E.2d 107 (1950).

*Id.* at 337-38, 432 S.E.2d at 294.

In the instant case, all State's evidence tending to show defendant murdered his wife was circumstantial. Nevertheless, under the standards set out above, there was abundant evidence from which the jury could infer defendant's guilt. State's evidence tended to show that defendant was enraged over the victim's involvement with Marvin Bynum. Defendant uttered racial slurs; hounded, threatened and assaulted the victim; enlisted and attempted to enlist the aid of family members in intimidating her; and told others he would kill her. In addition to his motive of revenge, defendant both had and anticipated financial difficulties. Other evidence tended to show that neither robbery nor rape was a motive in the victim's death. Defendant was seen with the victim on the morning of her disappearance under circumstances which permitted an inference that he was restraining her. During the interval before she was found, defendant suggested that one person could overcome her strength by tying her up; and medical evidence showed the victim's ankles and wrists were bound and something was around her neck. State's evidence showed further that during the same interval there were times in which defendant's whereabouts were unknown and a car like one to which he had access was seen on the road where her body was found, an area well

known to defendant, near his home, and having special significance in the couple's earlier life. Moreover, the victim was murdered in the exact way in which defendant told others he would kill her; and defendant possessed a shotgun of the same type as the murder weapon. Finally, State's and defendant's evidence showed that by his actions on the morning when the victim was found, defendant indicated he had independent knowledge of the location of her body.

All the evidence, taken most favorably for the State, was clearly sufficient to support a finding that defendant was the person who killed the victim. Therefore, we hold the trial court did not err in denying his motions to dismiss and submitting the case to the jury.

[8] Defendant's next contention is that the trial court erred in denying his motions to dismiss the charge of robbery with a dangerous weapon and in submitting the charge of common-law robbery to the jury. Defendant argues there was insufficient evidence to show either that (i) the crime of common-law robbery was committed or (ii) defendant committed it. Again, we disagree.

"To withstand a motion to dismiss a common law robbery charge, the State must offer substantial evidence that the defendant feloniously took money or goods of any value from the person of another, or in the presence of that person, against that person's will, by violence or putting the person in fear." *State v. Davis*, 325 N.C. 607, 630, 386 S.E.2d 418, 430 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990).

In the instant case State's evidence tended to show that on Sunday, 10 April 1988, Paula Bynum had the duty of closing the store. She put the currency receipts for that day's business and a cash register receipt in the safe; and she concealed the start-up money for the next day in the back room. On the next morning, around the time when the victim usually arrived at the store, defendant was seen holding her outside the store. Within minutes thereafter, a customer appeared, looking for the victim, whose car engine was warm. Shortly thereafter, Deputy Gardner discovered the open safe and empty cash register. Other evidence showed over $2500 was missing. The disappearance of the money was discovered around thirty minutes after defendant was seen with the victim outside the store. That the victim was being held outside the store and left without her pocketbook indicated she was acting under force and, possibly, fear. All the evidence supports an inference that she did not voluntarily part with the money belonging to the store and that it was taken concurrently with

her abduction. Her forceful abduction and the taking of the money are so closely related in time as to form a continuous chain of events.

Defendant argues that under *State v. Moore*, 312 N.C. 607, 324 S.E.2d 229 (1985), the evidence disclosed no more than an opportunity for defendant or others to have taken the money. However, in *Moore*, the victim discovered her wallet was missing some two hours after her encounter with defendant. During that time her purse, from which the wallet was taken, was left unattended in the store, whose back door was unlocked. Under these circumstances the Court found that anyone in the vicinity of the store, a high crime area, would have had opportunity to steal the wallet. *Id.* at 613, 324 S.E.2d at 233.

Defendant's case is easily distinguishable from *Moore*; and all the evidence, taken most favorably for the State, supports an inference that a common-law robbery was committed and defendant was the perpetrator. For these reasons we conclude the trial court did not err in denying defendant's motion and submitting the charge to the jury.

[9] Defendant also contends the trial court erred in refusing to dismiss the charge of first-degree kidnapping. Again, we disagree.

Kidnapping is the confining, restraining, or removing from one place to another of a person sixteen years of age or over without the person's consent and for a purpose prohibited by statute. N.C.G.S. § 14-39 (1993). Even the removal of a clerk from that part of a convenience store where the money is kept to some other location is sufficient to support the charge. *State v. Davidson*, 77 N.C. App. 540, 543, 335 S.E.2d 518, 520, *disc. rev. denied*, 314 N.C. 670, 337 S.E.2d 583 (1985), *and disc. rev. denied*, 315 N.C. 393, 338 S.E.2d 882 (1986); *see also State v. Lowry*, 263 N.C. 536, 541, 139 S.E.2d 870, 874 (stating fact, not distance, of forcible removal, constitutes kidnapping), *cert. denied*, 382 U.S. 22, 15 L. Ed. 2d 16 (1965). Similarly, removal of a victim from one location to another prior to murdering her will support a charge of kidnapping. *State v. Garner*, 330 N.C. 273, 294, 410 S.E.2d 861, 873 (1991).

Viewed most favorably for the State, the evidence showed defendant was seen restraining the victim outside the store within thirty minutes before her disappearance was discovered. The victim's pocketbook remained in the store; her car remained parked outside. After her body was discovered, autopsy findings included that her stomach was empty, her bladder was full, and her ankles, wrists, and neck had been bound. All the evidence supports an inference that

defendant forcibly removed the victim from the store and restrained her for many hours for the purpose of killing her. Therefore, we conclude the trial court did not err in denying defendant's motion and submitting the charge to the jury.

[10] Defendant next contends the trial court's instruction on reasonable doubt was erroneous. We disagree.

In accordance with defendant's specific request the trial court instructed as follows:

Now, what is a reasonable doubt?

A reasonable doubt is a doubt based on reason and common sense arising out of some or all of the evidence that has been presented or the lack or the insufficiency of the evidence, as the case may be.

To put it a different way, proof beyond a reasonable doubt is proof that fully satisfies you or entirely convinces you of the Defendant's guilt.

Now, ladies and gentlemen, our Supreme Court has further defined reasonable doubt.

The Supreme Court said a reasonable doubt is not a vain doubt; it's not an imaginary or fanciful doubt, but it is a sane and rational doubt.

When it is said that a Jury must be satisfied of the Defendant's guilt beyond a reasonable doubt, it is meant that they must be fully satisfied or entirely convinced or satisfied to a moral certainty of the truth of the charge.

If, after considering, comparing and weighing all the evidence, the minds of the Jurors are left in such condition that they cannot say they have an abiding faith to a moral certainty, in the Defendant's guilt, then they have a reasonable doubt.

Otherwise not.

The Court went on to say, ladies and gentlemen, a reasonable doubt as that term is employed in the administration of criminal law is an honest, substantial misgiving generated by the insufficiency of proof, and it's [sic] insufficiency which fails to convince your judgment and conscience, and satisfy your reason as to the guilt of the accused.

It is not a doubt suggested by the ingenuity of counsel or by your own ingenuity. Not legitimately warranted by the testimony or one born out of merciful inclination or disposition to permit the defendant to escape the penalties of the law or one prompted by sympathy for him or those connected with him.

Defendant argues this instruction is nearly identical to that found unconstitutional in *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339 (1990), *overruled in part by Estelle v. McGuire*, 502 U.S. 62, 116 L. Ed. 2d 385 (1991), and *State v. Montgomery*, 331 N.C. 559, 417 S.E.2d 742 (1992). Further, although the instruction was not identical, the trial court used a combination of terms similar to the combinations disapproved in *Cage* and *Montgomery* and stated the "moral certainty" test twice. Citing *Estelle v. McGuire*, 502 U.S. 62, ——, 116 L. Ed. 2d 385, 399, defendant argues there was a reasonable likelihood that the jury applied the instruction in a way that violated the Due Process Clause.

Since defendant made a specific request for the instruction, even if the instruction was erroneous as a matter of law, defendant could not complain. N.C.G.S. § 15A-1443(c) (1988). However, in light of *Victor v. Nebraska*, —— U.S. ——, 127 L. Ed. 2d 583 (1994), we find no error in the instruction.

In *Victor*, the Court stated as follows:

Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt, see *Jackson v. Virginia*, 443 U.S. 307, 320, n. 14 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Cf. *Taylor v. Kentucky*, 436 U.S. 478, 485-486 (1978). *Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury."* Holland v. United States, 348 U.S. 121, 140 (1954).

*Id.* at ——, 127 L. Ed. 2d at 590 (emphasis added, alteration in original). The Court carefully considered defendant Sandoval's argument that a modern jury would understand *moral certainty* "to allow conviction on proof that does not meet the beyond a reasonable doubt standard." *Id.* at ——, 127 L. Ed. 2d at 595. The Court accepted "Sandoval's premise that 'moral certainty,' standing alone, might not be recognized by modern jurors as a synonym for 'proof beyond a reasonable doubt.' " *Id.* Nevertheless, moral certainty language cannot be isolated out of context, and if the rest of the instruction lends content to the phrase, there is no

reasonable likelihood that a jury will understand "moral certainty to be disassociated from the evidence in the case." *Id.* at ——, 127 L. Ed. 2d at 597. Although the Court did not condone use of *moral certainty*, it concluded, "[I]n the context of the instructions as a whole we cannot say that the use of the phrase rendered the instruction given in Sandoval's case unconstitutional." *Id.*

Applying these principles, we conclude the trial court did not err in its use of moral certainty language. The rest of the instruction lent content to the phrase, and there is no reasonable likelihood that the jury understood moral certainty to be disassociated from the evidence in defendant's case. Reading the instruction in its entirety, and in light of *Victor*, we also reject defendant's argument that any combination of terms in the definition of reasonable doubt constituted error.

In *Victor*, the Court also considered defendant Victor's argument "that equating a reasonable doubt with a 'substantial doubt' overstated the degree of doubt necessary for acquittal." *Id.* at ——, 127 L. Ed. 2d at 599. The Court emphasized that *Cage* "did not hold that the reference to substantial doubt alone was sufficient to render the instruction unconstitutional." *Id.* Instead, an instruction whose "context makes clear that 'substantial' is used in the sense of existence rather than magnitude of the doubt," will not be found unconstitutional. *Id.*

In light of these principles we also reject defendant's argument that the instruction was erroneous because it included the words *substantial misgiving*. Since it also informed the jurors that a reasonable doubt is not a vain, imaginary, or fanciful doubt, the instruction properly focused on existence rather than magnitude of doubt.

For all the foregoing reasons, we conclude the challenged instruction on reasonable doubt was not violative of the Due Process Clause. Therefore, we hold the trial court did not err in giving the instruction.

[11] Defendant's last contention arising from the guilt-innocence phase is that the trial court gave an erroneous instruction on the charge of first-degree kidnapping. We find no prejudicial error.

After correctly instructing on the State's burden of proving each element of this offense beyond a reasonable doubt, the trial court concluded as follows: "However, if you do not so find, or have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of guilty."

**STATE v. BAKER**

[338 N.C. 526 (1994)]

This Court has repeatedly held that a lapsus linguae not called to the attention of the trial court when made will not constitute prejudicial error when it is apparent from a contextual reading of the charge that the jury could not have been misled by the instruction. *E.g., State v. Laws*, 325 N.C. 81, 98-99, 381 S.E.2d 609, 620 (1989), *judgment vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, 502 U.S. 876, 116 L. Ed. 2d 174, *reh'g denied*, 502 U.S. 1001, 116 L. Ed. 2d 648 (1991). In the instant case, the trial court repeatedly instructed the jury that the State had the burden of proving defendant was guilty beyond a reasonable doubt. The court also instructed that "[a]fter weighing all the evidence, if you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty." In addition, in its instructions on murder and common-law robbery, the court stated that if the jurors did not find each element had been shown, it would be their duty to return a verdict of not guilty. Reading the charge in its entirety, we are convinced the jurors could not have been misled by the omission complained of. Therefore, we hold there was no prejudicial error.

For all the foregoing reasons, we conclude defendant received a fair trial free of prejudicial error.

SENTENCING PROCEEDING

Defendant contends the trial court erred in instructing the jury as to two statutory mitigating circumstances, namely, (i) that the defendant had "no significant history of prior criminal activity," N.C.G.S. § 15A-2000(f)(1) (1988), and (ii) that he was "under the influence of mental or emotional disturbance," N.C.G.S. § 15A-2000(f)(2). We agree with this contention and so remand for a new capital sentencing proceeding.

The United States "Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances." *Zant v. Stephens*, 462 U.S. 862, 890, 77 L. Ed. 2d 235, 258 (1983). Instead, "the sentencer must be allowed to consider in mitigation 'any aspect of a defendant's character or record and any of the circumstances of the offense *that the defendant proffers* as a basis for a sentence less than death.' " *Delo v. Lashley*, —— U.S. ——, ——, 122 L. Ed. 2d 620, 626 (1993) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990 (1978)).

The Criminal Procedure Act provides that in capital sentencings, "[i]nstructions determined by the trial judge to be warranted by the evidence shall be given by the court in its charge to the jury prior to

its deliberation." N.C.G.S. § 15A-2000(b) (1988). Where there is no record evidence of a capital defendant's criminal history, the (f)(1) mitigating circumstance may not be submitted to the jury. *State v. Gibbs*, 335 N.C. 1, 436 S.E.2d 321 (1993), *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 881 (1994). Where there is evidence supporting this circumstance, "it is the trial court's duty 'to determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity.'" *State v. Artis*, 325 N.C. 278, 314, 384 S.E.2d 470, 490 (1989) (quoting *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988)), *death sentence vacated,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand,* 329 N.C. 679, 406 S.E.2d 827 (1991).

In *State v. Mahaley*, 332 N.C. 583, 423 S.E.2d 58 (1992), evidence "tended to show that the defendant had no record of criminal convictions. Evidence of prior history of criminal activities was limited to that tending to show her use of illegal drugs and her theft of money and credit cards to support her drug habit." *Id.* at 597, 423 S.E.2d at 66-67. This evidence "did not establish that the defendant had such a significant history of prior criminal activity that no rational jury could find the existence of" mitigating circumstance (f)(1). *Id.* at 598, 423 S.E.2d at 67. However, the trial court submitted as nonstatutory mitigating circumstances (i) that the defendant had no history of violence or physical injury to others and (ii) that the defendant had no record of criminal convictions. The Court found error, stating as follows:

> The trial court's submission of these two nonstatutory circumstances was inadequate because the trial court gave the jury the discretion, if it found either circumstance to exist, to determine "whether you deem this to have mitigating value." As a result of this instruction, the jury was not required to give any weight to such nonstatutory mitigating circumstances. By contrast, if a jury determines that a statutory mitigating circumstance exists, it *must* give that circumstance mitigating value. *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518 (1988).

In *Wilson*, we recognized that there was no way of knowing whether the failure to submit a statutory mitigating circumstance to the jury might have tipped the scales in favor of the jury determination that the aggravating circumstances outweighed the mitigating circumstances and were sufficiently substantial to call for the imposition of the death penalty. *Wilson*, 322 N.C. at 146, 367 S.E.2d at 606. "We have also recognized that common sense, fundamental fairness, and judicial economy require that any reason-

able doubt regarding the submission of a statutory or requested mitigating [circumstance] be resolved in favor of the defendant." *State v. Brown*, 315 N.C. 40, 62, 337 S.E.2d 808, 822 (1985).

*Id.* at 598-99, 432 S.E.2d at 67.

In the instant case, evidence showed defendant's criminal record was limited to one conviction for driving while impaired. However, evidence also showed that his criminal history included threats against, and at least one assault on, the victim.

**[12,13]** In submitting as a mitigating circumstance that "[t]he defendant has no record of criminal convictions," the trial court erred in several ways. First, the legislature "has determined that certain circumstances, as a matter of law, have mitigating value and *has expressly provided by statute* for their submission to the jury under appropriate circumstances." *State v. Wilson*, 322 N.C. 117, 144, 367 S.E.2d 589, 605 (1988) (emphasis added). If the trial court concludes that evidence of such appropriate circumstances exists, it is without discretion to vary the wording of this mitigating circumstance. Next, by erroneously changing the wording of the circumstance, the court also suggested it ignored evidence of defendant's uncharged crimes. Although the court's instruction included language directing the jurors to consider whether defendant had any significant history of prior criminal activity, the court concluded the instruction as follows: "You would find this mitigating circumstance if you find, ladies and gentlemen, that the defendant only has one conviction of driving while impaired on his record. And that this is not a significant history of prior criminal activity." Assuming arguendo that the trial court in fact considered defendant's criminal history as well as his criminal record, the jury's consideration of this circumstance was limited to defendant's record only. Finally, defendant contends, and we agree, that the trial court's instructions erroneously permitted the jurors, if they found this circumstance to exist, to decide it was without weight. In its oral instructions to the jury, the trial court distinguished between the two statutory mitigating circumstances submitted and the five nonstatutory circumstances. As to the former, the court instructed that if one or more jurors found each such circumstance, they should write "Yes" on the form. As to the latter, the court instructed that if one or more jurors found each such circumstance and deemed it to have mitigating value, they should write "Yes" on the form. However, the issues and recommendation form given the jury did not make this critical distinction. Instead, the jury was directed to

answer, as to all possible mitigating circumstances, whether "[o]ne or more of us finds this circumstance and deem [sic] it to have mitigating value." Thus the wording of the form directly contravened case law holding that having found the existence of a statutory mitigating circumstance, a jury may not refuse to give it weight or value. *E.g.*, *State v. Fullwood*, 323 N.C. 371, 396, 373 S.E.2d 518, 533 (1988) ("If the jury finds the existence of a statutory mitigating circumstance, it has 'found' that circumstance and cannot determine that it does not have mitigating value."), *death sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991).

This Court has no way of knowing how the trial court's errors affected the jurors' weighing of the aggravating and mitigating circumstances. We cannot know whether, if they had been allowed to consider all evidence relevant to the (f)(1) circumstance, the jurors would have declined to find its existence. Moreover, we cannot know if the jury declined to give this mitigating circumstance any weight, thereby tipping the scales in favor of their determination that the aggravating circumstances outweighed the mitigating circumstances and were sufficiently substantial to call for imposition of the death penalty. Therefore, we cannot conclude that the error in failing to properly submit the (f)(1) statutory mitigating circumstance was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b); *State v. Mahaley*, 332 N.C. at 599, 423 S.E.2d at 68.

Similarly, with respect to mitigating circumstance (f)(2), mental or emotional disturbance, it cannot be known whether the erroneous instruction on the issues and recommendation form functioned to permit the jury to decline to give any weight to this circumstance. For all the foregoing reasons we hold the trial court erred in its instructions on both statutory mitigating circumstances; and because of these errors, defendant is entitled to a new capital sentencing proceeding.

PRESERVATION ISSUE

[14] Defendant also contends the trial court erred in denying his motion for a bill of particulars disclosing statutory aggravating circumstances on which the State intended to rely in seeking the death penalty. Defendant concedes this issue was decided against his position in *State v. Taylor*, 304 N.C. 249, 283 S.E.2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983). We note that a similar argument was rejected in *State v. Roper*, 328 N.C. 337, 366, 402 S.E.2d 600, 617 (1991), *cert.*

*denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991). We have considered defendant's argument on this issue and find no compelling reason to depart from our prior holdings.

NO. 89CRS11600—FIRST-DEGREE MURDER OF SHIRLENE BAKER: NO ERROR IN THE GUILT PHASE; DEATH SENTENCE VACATED AND REMANDED FOR A NEW CAPITAL SENTENCING PROCEEDING.

NO. 89CRS11601—FIRST-DEGREE KIDNAPPING: NO ERROR.

NO. 89CRS11602—COMMON-LAW ROBBERY: NO ERROR.