461 S.E.2d 486

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Jacob W. BEARD, Defendant Below, Appellant.**

**No. 22504.**

Supreme Court of Appeals of West Virginia.

Submitted May 16, 1995.

Decided July 19, 1995.

---

744

Scott E. Johnson, Assistant Attorney General, Charleston, for appellee.

Stephen B. Farmer, Philip J. Combs, King, Allen & Arnold, Charleston, Frank W. Helvey, Jr., Public Defender, Charleston, for appellant.

WORKMAN, Justice:

Jacob Beard appeals from the June 4, 1993, judgment order of the Circuit Court of Pocahontas County finding him guilty of two counts of first degree murder, following a jury verdict returned on that same date. After examining the record in this case in conjunction with the numerous assignments

of error, we remand this case for purposes of a *Kastigar*[1] hearing.

On June 25, 1980, Vicki Durian and Nancy Santomero, who were hitchhiking to the annual Fourth of July gathering of the Rainbow people in Pocahontas County, were shot and killed in a remote section of that county known as Briery Knob. Not until April 16, 1992, were charges brought against any individual in connection with these two murders. At that time, Appellant, along with Johnnie Lewis, Winters "Pee Wee" Walton, Gerald Brown, Arnold Cutlip, William McCoy, and Richard Fowler were charged with first degree murder in connection with what had become known as the "Rainbow murders." These charges were dismissed without prejudice against Appellant and the other defendants pursuant to a July 17, 1992, order of the circuit court of Pocahontas County because "issues relating to the credibility of the evidence and testimony of certain of the State's principle (sic) witnesses as well as the conduct of the investigation itself ..." warranted further investigation.

Five of the seven individuals originally charged with the Rainbow murders were indicted on January 13, 1993. The two individuals who were not indicted—"Pee Wee" Walton and Johnnie Lewis—were granted immunity. Of the five individuals indicted, only Appellant was brought to trial. He was convicted of first degree murder on June 4, 1993, and sentenced to two concurrent life terms, both without mercy.[2]

Appellant asserts the following assignments of error: (1) trial court's refusal to admit polygraph test results; (2) trial court's exclusion of probative evidence regarding another individual's commission of the murders; (3) trial court's admission of scientific evidence not disclosed to Appellant until after trial began; (4) police misconduct; (5) trial court's failure to hold an in camera hearing

pursuant to the crime-fraud exception to the attorney/client privilege; (6) trial court's failure to grant Appellant's motion to dismiss for pre-indictment delay; (7) State's improper reliance upon evidence gained through an unauthorized grant of immunity; (8) trial court's admission of testimony tainted because of hypnosis; and (9) the cumulative error rule. We address each of the assignments of error[3] separately.

### I. Polygraph Results

■ Appellant urges this Court to adopt a new position with regard to the admissibility of polygraph results. We recently restated our long-standing rule that "'[p]olygraph test results are not admissible in evidence in a criminal trial in this State.'" Syl. Pt. 1, *State v. Chambers*, 194 W.Va. 1, 459 S.E.2d 112 (1995) (quoting Syl. Pt. 2, *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979)). Appellant argues that the rationale underlying *Frazier* is no longer valid since the United States Supreme Court issued its decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In *Frazier*, we explained that our rule regarding the inadmissibility of polygraph test results was premised on "the questionable scientific accuracy of the test." 162 W.Va. at 608, 252 S.E.2d at 43 (citing *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923)) (holding that expert opinion based on scientific technique is inadmissible unless technique is generally accepted as reliable in relevant scientific community). The Supreme Court in *Daubert* concluded that *Frye*'s "general acceptance" test was superseded by the adoption of the Federal Rules of Evidence and specifically, that admission of scientific evidence is governed by Federal Rule of Evidence 702.[4] — U.S. at — – —, 113 S.Ct. at 2794–96.

---

1. *See Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

2. Shortly after Appellant's conviction, all charges against his co-defendants were dismissed. The record does not disclose the basis for these dismissals.

3. Appellant alleges two additional assignments of error: (1) the incompetency of two witnesses;

and (2) insufficiency of the evidence. Finding no merit to these assignments, we decline to address them in full.

4. Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

This Court, in *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), extended the *Daubert* ruling to West Virginia by holding that the *Frye* "general acceptance" test was similarly supplanted by the adoption of Rule 702 of the West Virginia Rules of Evidence. *See* 191 W.Va. at 46, 443 S.E.2d at 203. In syllabus point two of *Wilt,* we held that:

> In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

*Id.* at 41, 443 S.E.2d at 198.

The State observes that Appellant leaps from the supersedence of *Frye,* first in *Daubert* and then in *Wilt,* to the conclusion that polygraph test results are now admissible under Rule 702 of the West Virginia Rules of Evidence. As the State correctly contends, nothing in either decision would suggest such a result. One commentator has

observed, "[a]lthough *Daubert* requires a different review by the trial court than *Frye* did, it will not necessarily change the court's determination of admissibility." Symposium, *The Impact of Science and Technology on the Courts,* 43 Emory L.J. 853, 861 (1994). Consistent with this observation, the court in *United States v. Black,* 831 F.Supp. 120 (E.D.N.Y.1993), concluded that "nothing in *Daubert* would disturb the settled precedent that polygraph evidence is neither reliable nor admissible." *Id.* at 123. In explaining its position, the *Black* court stated:

> 'That the *Frye* test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. *To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'*
>
> . . . .
>
> The Second Circuit has held that 'the results of polygraph examinations are not admissible in this Circuit'. . . . [T]he district court determined that 'it did not believe polygraph tests were *sufficiently reliable* to warrant the admission of results in evidence'. . . . Nothing in *Daubert* changes the rationale set forth in . . . [prior decisions]. The polygraph test is simply not sufficiently reliable to be admissible.

831 F.Supp. at 122–23 (quoting, in part, *Daubert,* —— U.S. at —— —— ——, 113 S.Ct. at 2794–95) (emphasis supplied by *Black*) (citations omitted).[5]

---

thereto in the form of an opinion or otherwise." Our state corollary to Rule 702 of the Federal Rules of Evidence, parallels in exact fashion the language of the federal rule. *See* W.Va.R.Evid. 702.

**5.** The first and universal requirement for the admissibility of scientific evidence is that the evidence must be both "reliable" and "relevant." Under *Daubert/Wilt,* the reliability requirement is met only by a finding by the trial court under Rule 104(a) that the scientific or technical theory which is the basis for the test results is indeed "scientific, technical, or . . . specialized knowledge." The trial court's determination regarding

whether the scientific evidence is properly the subject of "scientific, technical, or other specialized knowledge" is a question of law that we review de novo. An example of that sort of legal determination by the trial court is detailed in *Daubert,* in which the Court explained that part of a trial court's "gatekeeping" function under Rule 702 when, for example, scientific testimony is offered, is the determination whether "the reasoning or methodology underlying the testimony is scientifically valid." —— U.S. at ——, 113 S.Ct. at 2796. On the other hand, the relevancy requirement compels the trial judge to determine, under Rule 104(a), that the scientific evidence "will assist the trier of fact to under-

■ Like the court in *Black*, we too, reaffirm the conclusion that "[t]he polygraph test is simply not sufficiently reliable to be admissible." 831 F.Supp. at 123; *accord* 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4–12(F)(3) at 457 (3rd ed. 1994). Despite Appellant's noteworthy efforts at trying to elevate the image of polygraph results,[6] we remain convinced that the reliability of such examinations is still suspect and *not* generally accepted within the relevant scientific community. Therefore, any speculation that our position in *Frazier* regarding polygraph admissibility is in question due to the *Daubert/Wilt* rulings is put to rest today.[7]

■ Appropriate instructions cured any references made by witnesses Lewis and Walton to the taking of polygraphs. As we recognized in syllabus point one of *State v. Acord*, 175 W.Va. 611, 336 S.E.2d 741 (1985), " '[o]rdinarily where objections to questions

or evidence by a party are sustained by the trial court during the trial and the jury instructed not to consider such matter, it will not constitute reversible error.' Syl. pt. 18, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966)." 175 W.Va. at 612, 336 S.E.2d at 742. Upon the first reference to a polygraph test during the cross-examination of Walton, the trial court instructed the jury:

Now, ladies and gentlemen of the jury, you will disregard any reference or any comment about any lie detector test or polygraph test. Any such tests are not admissible in the State of West Virginia. They are not reliable, and they have not been authorized to be administered. If there was any test given or made, results are not considered by the jury and you shall disregard it.

Later, when Lewis referenced a polygraph during his cross-examination, the judge again

---

stand the evidence or to determine a fact in issue." W.Va.R.Evid. 702. Appellate review of the trial court's rulings under the relevancy requirement are reviewed under an abuse of discretion standard.

6. Appellant suggests that the error rate for polygraph examinations is lower than that for handwriting analyses and eyewitness identifications. *See* J. Widacki and F. Horvath, *An Experimental Investigation of the Relative Validity and Utility of the Polygraph Technique and Three Other Common Methods of Criminal Identification*, 23 J. Forensic Sci. 596 (1978). Appellant further posits that the empirical validity of polygraphs is far more easily tested than evidence of "Rape Trauma Syndrome," "Battered Spouse Syndrome," and "Cultural and Subcultural Difference." We note, however, that the nature of this type of evidence significantly differs from a polygraph test result, which forms "a separate testimonial basis of the facts relating to the crime." *Frazier*, 162 W.Va. at 619, 252 S.E.2d at 49.

7. The Appellant calls our attention to a recent Fifth Circuit case, *United States v. Posado*, 57 F.3d 428 (5th Cir.1995), where that court held that the trial court committed error by adhering to a per se exclusionary rule regarding the admissibility of polygraph tests results. We believe that Appellant's reliance on *Posado* is misplaced. Initially, it is necessary to put *Posado* in its proper procedural context. The sole issue was whether polygraph evidence was admissible for purposes of bolstering the defendant's testimony that he did not consent to a search during a *pretrial hearing* of a motion to suppress. Without taking a position as to its admissibility, the Fifth Circuit stated that *Daubert* precludes per se ex-

clusionary rules when dealing with scientific evidence. Rather, the court stated the trial court was required to go through the analysis announced in that opinion. What cannot be overlooked, however, is the court's statement that "[a]ssuming that polygraph evidence satisfies the requirements of Rule 702 does not end the inquiry. Other evidentiary rules, such as Rule 403, may still operate to exclude the evidence." 57 F.3d at 435. Because it was a nonjury hearing, the court felt that Rule 403 was not significant:

the evidence was not offered at trial before a jury, but in a pretrial hearing before the district court judge. A district court judge is much less likely than a lay jury to be intimidated by claims of scientific validity into assigning an inappropriate evidentiary value to polygraph evidence. We have consistently held that the rules of evidence are relaxed in pretrial suppression hearings.

57 F.3d at 435.

We agree with the Fifth Circuit as to the function of Rule 403 in nonjury hearings. *See In re Carlita B.*, 185 W.Va. 613, 633, 408 S.E.2d 365, 385 (1991) (Miller, J., concurring); *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir.1994) ("we hold that in the context of a bench trial, evidence should not be excluded under 403 on the ground that it is unfairly prejudicial"). However, the case sub judice is different as the polygraph evidence was proffered for the jury's consideration, and, in addition to what we have said in the text of this opinion, the evidence could have been excluded under Rule 403. Even giving the Appellant the benefit of the most favorable language in *Posado*, we find no abuse of discretion in excluding the polygraph evidence.

reminded the jury "to remember my previous admonition. Do not speculate about what any test may or may not have been. It's not admissible." Given the judge's careful and continued admonitions to the jury regarding its duty to disregard any references to polygraph tests, we find no error on this issue.

## II. Exclusion of Franklin Statements

■■■ Prior to trial, Appellant moved to introduce the confession of Joseph Paul Franklin, a convicted serial killer serving three life sentences at a federal penitentiary in Marion, Illinois. On March 1, 1984, Franklin told Special Agent Ernest V. Smith of the Wisconsin Department of Justice that he had killed two white females in West Virginia [8] and provided a hand drawn map depicting the location of the murders. He later repeated these statements to agents with the Federal Bureau of Alcohol, Tobacco, and Firearms. When he was interviewed by West Virginia State Police Trooper Debbie DeFalco, he initially denied involvement in the murders but then took responsibility for the killings.[9] Following these three instances, however, Franklin refused to talk further about his involvement in the murders.

Appellant sought to introduce Franklin's confession, as well as a detailed map drawn by Franklin in the presence of Wisconsin officials, which allegedly corroborated his confession.[10] The trial court, applying Rule 804(b)(3) of the West Virginia Rules of Evidence, refused to admit the confession on the grounds that it lacked the requisite guarantees of trustworthiness. Rule 804(b)(3) provides the following exception to the general prohibition against hearsay:

> Statement against Interest. — A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

W.Va.R.Evid. 804(b)(3) (emphasis supplied).

■■■ We begin our analysis by noting that trial courts have broad discretion in making evidentiary rulings and this Court will not overturn those rulings unless there has been an abuse of discretion. *State v. Bell*, 189 W.Va. 448, 453, 432 S.E.2d 532, 537 (1993). An appellate court should find an abuse of discretion only when the trial court has acted arbitrarily or irrationally. *State v. McGinnis*, 193 W.Va. 147, 159, 455 S.E.2d 516, 528 (1994). In making its ruling, the trial court reasoned:

> I am not going to allow his statements because I don't think they have the degree of trustworthiness from a person who is incarcerated and makes one statement today and then won't talk to you after that about it, and then changes his mind when our own officers are there conducting the statement. That it lacks credibility. And

---

8. Franklin offered this information in connection with questioning by Agent Smith concerning the May 2, 1980, murder of a white female in Wisconsin.

9. Only Franklin's denial of any involvement in the murders is on the tape recording of the interview of Franklin by West Virginia State Police Officer DeFalco. Later, when Franklin purportedly changed his story and admitted involvement, a recording device was apparently not being utilized.

10. Appellant contends that the map corroborates Franklin's confession by showing: (1) his route of travel from a bank robbery he committed in North Carolina to the West Virginia murder scene; (2) the location in West Virginia where he picked up the hitchhiking Rainbow victims; (3) the store where he purchased gasoline shortly before the murders; (4) the location of the encampment for the Rainbow gathering; (5) a winding dirt road and the smaller dirt road leading to the isolated area where he killed the victims; and (6) the parallel position of the bodies, laying as they were discovered. The State argued that the map lacked sufficient indicia of reliability as it lacked any route numbers or towns to "indicate with any certainty that ... [the map refers to] this area." The State also relied on the fact that Franklin claimed he committed the murders in Beckley County.

when you couple that with and four-time loser [11] that has nothing to gain or lose with respect to what the statement is made. (footnote added)

This ruling was made consistent with the recognition in *United States v. MacDonald*, 688 F.2d 224 (4th Cir.1982), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983), that

> [i]t is to be recalled that Rule 804(b)(3) places upon the proponent of a statement against interest a formidable burden. The declaration offered to exculpate the accused must be supported by corroborating circumstances that *'clearly* indicate the trustworthiness of the statement.'... As the Advisory Committee's Notes on this provision instruct, the risk of fabrication in this setting is significant. Consequently, rather than permitting only the jury to decide what weight to give the evidence, the initial responsibility is vested in the ... [trial] [c]ourt.

688 F.2d at 233 (quoting, in part, Fed.R.Evid. 804(b)(3) [12]) (emphasis supplied); *see also* 2 Cleckley, *supra*, § 8–4(B)(3) at 283 (discussing Rule 804(b)(3)'s requirement of "a finding that the circumstances clearly indicate that the statement was not fabricated").

Appellant simply did not meet the "formidable burden" imposed by Rule 804(b)(3). *MacDonald*, 688 F.2d at 233. Like the circuit court below, the trial court in *Mac-*

*Donald* was presented with declarations by an individual whose "pattern of remarks in admitting and denying complicity rendered her hopelessly unreliable." *Id.* Franklin's refusal to speak further with any West Virginia authorities regarding his commission of the murders coupled with his vacillating statements provided the circuit court with convincing evidence of *lack* of trustworthiness. Quite simply, the absence of sufficient guarantees against the fabrication of the Franklin confession compel the conclusion that the circuit court did not abuse its discretion in refusing to admit the substance of Franklin's confession.[13] *See MacDonald* 688 F.2d at 233; Cleckley, *supra*, § 8–4(B)(3) at 283 (stating that standard governing the admission of statements under Rule 804(b)(3) is abuse of discretion).

### III. Paint Chip Evidence

In response to discovery requests propounded to the State on March 16, 1993, Appellant was apprised of the existence of a July 14, 1980, F.B.I. report analyzing paint chips found on Nancy Santomero's clothing. The paint chips themselves were apparently misplaced by the State until the end of the first day of trial. Upon the re-discovery of the original paint chip samples, the State had a second analysis performed by Sergeant Alkire of the state police. Appellant argues that the trial court's admission of the paint chip samples and the second analysis of the samples [14] violates Rule 16 of the West Virgi-

---

**11.** Appellant's counsel corrected the judge by injecting that Franklin had only been convicted three times.

**12.** The text of Federal Rule of Evidence 804(b)(3) and West Virginia Rule of Evidence 804(b)(3) are identical.

**13.** The circuit court did permit the jury to be apprised through the testimony of West Virginia State Police Corporal Michael Jordan of the following limited facts regarding the Franklin confession: (1) that Franklin said he committed the murders; (2) that when interviewed by West Virginia police officers, he gave conflicting statements; and (3) that he currently refuses to talk to West Virginia authorities about the murders. During the course of Corporal Jordan's testimony regarding these matters, the trial court offered this instruction to the jury:

> I have permitted this much of the evidence and testimony about the witness Franklin. That

these officers went. They had interviews—or some officers did.... That statements were made, that statements were changed, and that the witness would not talk to them any further.
What the witness said is hearsay. And the contents of his statements and testimony the Court is not going to allow except to the extent that it is admitted so that you know what these officers did in following up these leads. You may consider it for that purpose. Otherwise, it is inadmissible.

**14.** Instead of the two layers of paint previously indicated in the 1980 F.B.I. report, Sergeant Giacalone's report included a finding of four layers of paint. The 1980 F.B.I. report indicated that the paint chips particles consisted of a gray primer covered by a blue-green metallic lacquer. The 1993 analysis, performed by Sergeant Giacalone, concluded that there were four layers: black primer covered by gray primer covered by light blue metallic acrylic lacquer covered by a black overcoat.

nia Rules of Criminal Procedure, that the evidence is unreliable, and that the balancing test required by Rule 403 of the West Virginia Rules of Evidence bars the admission of such evidence. Additionally, Appellant claims that he was precluded from performing any independent testing of the chips due to the misplacement of the samples.[15]

▮▮▮▮ Appellant contends that the State violated the rule established in *State v. Hager*, 176 W.Va. 313, 342 S.E.2d 281 (1986), *overruled on other grounds by State v. Woodson*, 181 W.Va. 325, 382 S.E.2d 519 (1989), governing the admission of material evidence not disclosed until trial:

> Where the State is unaware until the time of trial of material evidence which it would be required to disclose under a Rule 16 discovery request, the State may use the evidence at trial provided that: (1) the State discloses the information to the defense as soon as reasonably possible; and (2) the use of the evidence at trial would not unduly prejudice the defendant's preparation for trial.

Syllabus, *Hager*, 176 W.Va. at 313, 342 S.E.2d at 282. Appellant argues initially that the State violated the first *Hager* requirement by not disclosing the paint chip evidence "as soon as reasonably possible." *Id.*

The State maintains that they first re-discovered the existence of the paint chip evidence on May 17 or 18, 1993, and then made Appellant aware of such discovery on May 18, the day before opening statements. Appellant does not suggest that delay occurred at this juncture, but instead relies on Sergeant Alkire's testimony that to the best of his knowledge, no person acting on the State's behalf made any effort to contact the State Police Criminal Investigation Bureau in response to Appellant's March 1993 discovery motion. Sergeant Alkire also testified, however, that he had made unsuccessful efforts in October or November of 1992 to locate the paint chip evidence.

The flaw in Appellant's argument is that the *Hager* rule regarding disclosure pertains to sharing discovered evidence in a diligent fashion; it does not portend the requirement implied by Appellant—that any dilatoriness in actually discovering the evidence should bar the admission of such evidence. Moreover, even Appellant's counsel conceded that the State "thought they [the paint chips] were lost[ ]" and that "no ill motive" was attributed against the State in connection with the last minute discovery of the paint chip samples. We conclude, therefore, that the record in this case supports the State's conclusion that it disclosed the paint chip discovery "as soon as reasonably possible." *Hager*, 176 W.Va. at 313, 342 S.E.2d at 282, Syllabus.

▮▮▮ Appellant also asserts that admission of the paint chip evidence is barred by the second requirement of *Hager* that the use of such evidence "would not unduly prejudice the defendant's preparation for trial." *Id.* On this issue of prejudice, the trial court recognized that "the defense hasn't actually disclosed its defense yet, officially[,] . . . [b]ut if it's an alibi defense, this can't be prejudice."[16] Moreover, the circuit court recognized that "there is still time to undertake to rebut it [the new paint chip report]. There is even time to have the samples analyzed if . . . [the State] want[s] to. . . ." The record suggests that Appellant did not request the opportunity to perform an independent analysis of the re-discovered paint chip evidence. Our cases have consistently expressed a preference for continuance when there has been a discovery violation. *State ex rel. Rusen v. Hill*, 193 W.Va. 133, 141, 454 S.E.2d 427, 435 (1994); *Martin v. Smith*, 190 W.Va. 286, 291, 438 S.E.2d 318, 323 (1993); *State v. Barker*, 169 W.Va. 620, 623, 289 S.E.2d 207, 210 (1982) ("even if this were a 'proper' case in which to claim surprise, the appellant failed to move for a continuance, and, therefore, waived his right to one"). Accordingly, we find no abuse of discretion with regard to the

---

**15.** The record reveals, however, that the circuit court even suggested that Appellant had time to have a separate analysis performed on the newly discovered paint chip evidence, but Appellant failed to move the trial court for such testing.

**16.** The defense relied upon by Appellant at trial was one of alibi. He was supposedly attending a school board meeting during the relevant time period.

trial court's conclusion that Appellant's trial preparation was not prejudiced by the introduction of the paint chip evidence.

On the issue of reliability, Appellant maintains that the State failed to establish a proper chain of custody sufficient to warrant the admission of the paint chip evidence. Evidence may not be admitted unless it is authenticated in a manner sufficient to support a finding that the proffered object is what the proponent of its admission claims it is. *See* W.Va.R.Evid. 901(a). We recently reviewed the rules regarding chain of custody requirements in *State v. Dillon,* 191 W.Va. 648, 654, 447 S.E.2d 583 (1994), stating that "to allow the admission of physical evidence into a criminal trial, 'it is only necessary that the trial judge, in his discretion, be satisfied that the evidence presented is genuine and, in reasonable probability, has not been tampered with.'" *Id.* at 662, 447 S.E.2d at 597 (quoting, in part, *State v. Davis,* 164 W.Va. 783, 786–87, 266 S.E.2d 909, 912 (1980)). Evidence adduced regarding the chain of custody showed that Dr. Sopher, the State's medical examiner, removed the paint chips at issue from Nancy Santomero's clothing and sent such chips to the state police crime lab. Due to the succession of officers in charge of the evidence, it was shown through the testimony of Sergeant Giacalone that he had received the paint chip evidence from his predecessor Corporal Keyo who had received it from Lieutenant Barber. While the paint chip evidence was under the control of Lieutenant Barber, it was sent for analysis to an F.B.I. laboratory. The paint chips were returned to the state police crime lab and

remained in the lab following such return.[17] In these circumstances, the court properly ruled that the evidence was sufficiently authenticated to permit its admission into evidence. We find no abuse of discretion in the court's conclusion that a proper chain of custody had been established through the testimony of Sergeant Giacalone.

The final ground upon which Appellant alleges error concerning the admission of the paint chip evidence is under Rule 403 of the West Virginia Rules of Evidence.[18] Appellant argues that the probative value of the paint chip evidence was substantially outweighed by the danger of unfair prejudice. Specifically, Appellant contends that the unavailability of the van [19] from which the paint chips were alleged by the State to have emanated [20] substantially reduced the probative value of Sergeant Giacalone's microscopic analysis of the paint chip evidence performed on May 17, 1993. The record reveals that both the unavailability of the van and the paint chip analysis were the subject of aggressive and extensive cross-examination.

Appellant's counsel conducted a vigorous cross-examination of Sergeant Giacalone regarding the second paint chip analysis that he performed. During this cross-examination, he admitted that it would be helpful to have a comparison between the paint chips and the suspect vehicle. In addition, Sergeant Giacalone admitted on cross-examination that his paint chip analysis was not inconsistent with the defense's theory that the paint originated from a Chevy Nova, a vehicle in which witnesses allegedly spotted

17. Sergeant Giacalone testified that he discovered the paint chip evidence within a manila coin envelope in his locker inside of a box on May 17, 1993.

18. Rule 403 of the West Virginia Rules of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

19. Neither the State nor Appellant had access to the actual van for comparison purposes, as it had already been scrapped.

20. The State's theory was that the paint chips came from the van of Richard Fowler, originally a co-defendant of Appellant. The State's theory included the postulation that the two victims had been in Fowler's van partying prior to the murder and that the murders had resulted following the victims' denial of sexual favors to Appellant and his prior co-defendants. Through the testimony of Jerome F. Davis, the immediate owner of Fowler's van prior to Fowler's purchase of the vehicle, the State attempted to connect the paint chips taken from Ms. Santomero to Fowler's van. Davis testified that in 1976 he had painted the van a light metallic blue and further, that at some point, he had put black enamel on the bottom of the van.

the two hitchhikers exiting from prior to the murders. Thus, as the State notes, "even if Fowler's van was not available for comparison, the jury had placed before [it] all the relevant evidence designed to discredit the probative value of the evidence."[21] We conclude that the trial court correctly determined that the paint chip evidence was relevant in light of the proffered testimony regarding the removal of paint chips by Dr. Sopher from Nancy Santomero's body, the prospective testimony regarding the hitchhikers having been in Richard Fowler's blue van, and the state's theory that the bodies had been dragged from the van. Accordingly, we find no error in the trial court's admission of the paint chip evidence under Rule 403, either from a probative value analysis or from a confusion of the jury analysis. *See* W.Va.R.Evid. 403.

### IV. Police Misconduct

■ Prior to trial, Appellant moved to dismiss the indictment against him based upon allegations of police misconduct involving "Pee Wee" Walton and Johnnie Lewis.[22] The trial court permitted Walton and Lewis to testify concerning the specific abuse or intimidation that they allegedly experienced[23] and gave the following instruction to the jury regarding this testimony:

> you have heard evidence that the State's witness, Winters Charles Walton ["Pee Wee"] was physically beaten, threatened and intimidated by a West Virginia State Police officer before giving a statement against Mr. Beard. Likewise, you have heard evidence that the State's witness, Johnnie Washington Lewis, was threatened and intimidated by a State Police officer before giving evidence against Mr. Beard. Therefore, you should consider this evidence when weighing the credibility of these witnesses, and if you believe these threats, intimidation, and/or physical abuse

by the State Police has affected the testimony of … these witnesses, you may disregard their testimony in its entirety, or give it such weight as you think it entitled.

*See Cain v. State*, 594 N.E.2d 835, 840 n. 6 (Ind.Ct.App.1992) ("The extent to which threats may have, in some degree, affected a third party's testimony goes to the weight to be given the testimony, not to its admissibility.").

Appellant urges this Court to find, like the New York Court of Appeals in *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978), that "the police conduct, when tested by due process standards, was so egregious and deprivative as to impose upon us an obligation to dismiss." *Id.* at 717, 378 N.E.2d at 81. The trial court in *Isaacson* "found as a matter of fact" the following police conduct:

> an investigator of the New York State Police struck Breniman [third party turned informant] with such force as to knock him out of a chair, then kicked him, resulting in a cutting of his mouth and forehead, and shortly thereafter threatened to shoot him. Breniman testified that his abuse was administered because he refused to answer a question, that when struck his glasses flew off, that he was kicked in the ribs when down, that a chair was thrown at him, that he was also threatened with being hurled down a flight of steps, and that one of two uniformed State troopers who witnessed these events said, 'I [Breniman] may as well forget about it. They would swear that I fell coming in the substation on the steps.'

*Id.* at 715, 378 N.E.2d at 79.

Although Appellant argues that the instant case is factually similar to *Isaacson* on the issue of police conduct, there is a fundamental difference between the two cases. In

---

**21.** Furthermore, since Appellant claimed not to have been in the van, the analysis did not inculpate him under his theory of the case.

**22.** Appellant did not object to the testimony of these individuals at trial on grounds of alleged police misconduct.

**23.** Walton testified that Sergeant Estep bent, but did not break, his glasses and that the sergeant

placed his foot on the back of Walton's neck when Walton was in a prone position. Walton also testified that Sergeant Estep threatened to strike his testicles and referred to the type of sexual abuse Walton might incur if he went to prison. The only abuse Lewis testified to was handcuffs being swung at him, but not touching him.

contrast to this case, the *Isaacson* trial court made specific factual findings of police misconduct. The present case lacks any similar factual finding of police abuse.[24] Another glaring distinction between the two cases is that *Isaacson* involved the issue of entrapment. Without more evidence than presented by the record in this case, we cannot conclude, as the *Isaacson* court ruled, that a dismissal is warranted on due process grounds. *See* 406 N.Y.S.2d at 717, 378 N.E.2d at 81.

While we are not unmindful of the possibility that police officers may choose to protect each other when it comes to allegations of misconduct, we are also cognizant of the fact, as acknowledged in *Isaacson* that ' "[c]riminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer." ' *Id.* at 721, 378 N.E.2d at 85 (quoting *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 820–21, 2 L.Ed.2d 848 (1958)). The *Isaacson* court identified four factors[25] to be considered in determining whether a due process violation had occurred as a result of police action and cautioned that "[n]o one of these submitted factors is in itself determinative but each should be viewed in combination with all pertinent aspects and in the context of proper law enforcement objectives—the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness." 406 N.Y.S.2d at 719, 378 N.E.2d at 83. While the *Isaacson* case presents an excellent discussion of due process analysis in the context of police misconduct, extension of the *Isaacson* holding is unwarranted given the absence of a trial court finding of police abuse and the additional missing element of entrapment.

### V. Crime–Fraud Exception

■■ Appellant cites error in the trial court's refusal to hold an in camera hearing concerning the applicability of the crime-fraud exception to the attorney/client privilege arising from lawyer Marilyn Thompson's representation of Johnnie Lewis. The predicate for this assignment was the fact that while in Ms. Thompson's presence, Lewis stated at least five different times that he was not present when the Rainbow victims were killed and that he knew nothing about the murders. Then in September 1992, when Ms. Thompson was not present he changed his story to implicate Appellant.[26] Upon becoming aware of her client's altered statements, Ms. Thompson sought and was granted permission to withdraw as Lewis' counsel.

The purpose of the crime-fraud exception to the attorney/client privilege was explained in *United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), as seeking "to assure that the 'seal of secrecy,' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Id.* at 563, 109 S.Ct. at 2626 (quoting *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) and *O'Rourke v. Darbishire,* [1920] A.C. 581, 604 (P.C.)). The Supreme Court in *Zolin* announced the following standard for determining whether to hold an in camera hearing relevant to the crime/fraud exception:

> Before engaging in *in camera* review to determine the applicability of the crime-

---

**24.** Sergeant Estep denied making any threats or inflicting any of the abuse claimed by Walton. Corporal J.S. Tincher, who was present at the time of the alleged abuses against Walton, corroborated Sergeant Estep's denial.

**25.** Those factors are:

(1) whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity; (2) whether the police themselves engaged in criminal o[r] improper conduct repugnant to a sense of justice; (3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness; and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace.

406 N.Y.S.2d at 719, 378 N.E.2d at 83 (citations omitted).

**26.** Previously, on April 16, 1992, after allegedly being threatened and intimidated by Sergeant Estep, Lewis implicated Appellant. Subsequent to this statement though, Lewis denied any knowledge of the murders on five separate occasions while in the presence of his counsel, Ms. Thompson.

fraud exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

Once that showing has been made, *the decision whether to engage in in camera review rests in the sound discretion of the district court.* The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

491 U.S. at 572, 109 S.Ct. at 2630–31 (emphasis supplied).

Appellant contends that he met the *Zolin* threshold requirement of establishing a sufficient showing to invoke the crime-fraud exception. We disagree. The evidence relied upon by Appellant to meet the *Zolin* burden[27] does not suggest that Lewis and his counsel had "communications ... in furtherance of a future crime or fraud." *Id.* at 563, 109 S.Ct. at 2626. At most, it suggests that Lewis was subject to suggestion or that he was intimidated by the police and changed his story when not protected by counsel. Appellant's evidence does not, however, suggest that Appellant conferred with Ms. Thompson with the objective of committing a prospective fraud upon the court. The trial court did not abuse its discretion in refusing to hold an in camera hearing since Appellant failed to make a sufficient showing regarding the applicability of the crime-fraud exception.

## VI. Pre-indictment Delay

■ Appellant maintains that the thirteen-year delay between the murders and his indictment constitutes a violation of his due process rights. In support of his argument, he claims to have been severely prejudiced by the lengthy time span between the commission of the murders and the indictment due to the death of several witnesses; the destruction of his employer's work records; the occurrence of a natural disaster which destroyed evidence in the State's possession; significant changes to the crime scene; his inability to challenge the credibility of the State's witnesses by investigating their activities on the date of the murder; and the destruction of Richie Fowler's van in 1987 for scrap value.

■ Appellant relies on *State ex rel. Leonard v. Hey,* 269 S.E.2d 394 (1980), in which this Court held that

[a] delay of eleven years between the commission of a crime and the arrest or indictment of a defendant, his location and identification having been known throughout the period, is presumptively prejudicial to the defendant and violates his right to due process of law, U.S. Const. Amend. XIV, and W.Va. Const. art. 3, § 10. The presumption is rebuttable by the government.

269 S.E.2d at 394, Syl. Pt. 1. As the State points out, however, the facts in *Hey* differ substantially from those present in this case. In *Hey,* the State "had all the evidence upon which to proceed[ ]" during that eleven-year span, whereas in the instant case the State maintains that not until April of 1992 did Lewis and Walton provide information implicating Appellant. 269 S.E.2d at 395.

In *Hundley v. Ashworth,* 181 W.Va. 379, 382 S.E.2d 573 (1989), we refused to apply the burden-shifting mechanism announced in *Hey* "because the prosecutor was not shown to have knowledge of the identity and location of the defendant." *Id.* at 382, 382

---

**27.** The essence of the evidence that Appellant contends meets the threshold burden test of *Zolin* is that: Lewis initially denied any knowledge of the Rainbow murders; after alleged police intimidation he implicated Appellant; while in the presence of his counsel, Ms. Thompson, he denied five times any knowledge of the murders; Lewis again reimplicated Appellant when with police officers out of the presence of his counsel; and Lewis' counsel withdrew upon learning of his altered statement.

S.E.2d at 576; *accord State v. Carrico*, 189 W.Va. 40, 427 S.E.2d 474 (1993) (holding that two-year pre-indictment delay did not violate defendant's due process rights since government promptly sought indictment upon securing sufficient evidence). As was the case in *Hundley*, there is no need to engage in a *Hey* burden-shifting analysis because there is no evidence that the State had knowledge prior to April 1992 connecting Appellant with the Rainbow murders.

In essence, Appellant's pre-indictment delay argument is truly a complaint that the State's investigation of the Rainbow murders spanned more than a decade. Yet, Appellant does not charge that the State failed to use reasonable diligence in securing an indictment upon " 'discovering sufficient facts to justify indictment.' " Syl. Pt. 1, in part, *Carrico*, 189 W.Va. at 42, 427 S.E.2d at 476 (quoting *Hey*, 269 S.E.2d at 398). We find no reversible error on the issue of pre-indictment delay as the State was investigating the crimes during the thirteen-year post-crime delay and promptly charged Appellant once it had the necessary grounds to secure an indictment.

### VII. *Kastigar* Hearing

Prior to trial, Appellant sought a hearing for the purpose of requiring the State to demonstrate that its case rested entirely on evidence obtained independent of the State's grant of immunity to Appellant. This proceeding, known as a *Kastigar* hearing, places the burden on the State to affirmatively demonstrate that the evidence upon which it intends to rely "was derived from legitimate independent sources" and not from the immunized testimony. *See Kastigar v. United States*, 406 U.S. 441, 461–62, 92 S.Ct. 1653, 1665–66, 32 L.Ed.2d 212 (1972). The trial court refused to hold the requested *Kastigar* hearing, and ruled that only *statements* given by Appellant to police subsequent to the grant of immunity were not to be admitted at trial without first holding an in camera hearing on their admissibility.

On February 3, 1983, the State granted Appellant immunity in exchange for his cooperation with the investigation of the Rainbow murders. The agreement, signed by the Pocahontas County Prosecuting Attorney and Appellant,[28] provided that:

> The State of West Virginia agrees not to bring charges or to prosecute the said Jacob Beard for any involvement he may have had in the 'Rainbow Murders' as an accessory after the fact, but it is herein expressly understood and agreed that there shall be no immunity granted ... for any direct involvement in the said murders as a principal, or as an accessory before the fact. If the State ... deems the testimony of Jacob Beard to be useless to ... [it], he will nonetheless be granted use immunity for any statements he makes to the said State of West Virginia, its agents or officers pursuant to this agreement.

Appellant contends that during the course of the investigation, in specific reliance on this grant of immunity, he provided statements regarding his knowledge of the Rainbow murders. He further maintains that the State made both direct and indirect use of information provided pursuant to the agreement. *See Braswell v. United States*, 487 U.S. 99, 117, 108 S.Ct. 2284, 2294–95, 101 L.Ed.2d 98 (1988) ("Testimony obtained pursuant to a grant of statutory use immunity may be used neither directly nor derivatively."). As an illustration of direct use, Appellant cites the State's reading to the grand jury a statement he made upon his arrest to Florida authorities.[29]

The mandatory nature of a *Kastigar* hearing was recently discussed by the Fourth

---

**28.** Although the prosecutor failed to obtain court approval of the immunity agreement, as required by West Virginia Code § 57–5–2 (1966), we explained in *State v. Hanson*, 181 W.Va. 353, 382 S.E.2d 547 (1989), that the State is nonetheless prohibited from using evidence that was secured or induced through a grant of immunity. *See id.* at 358–61, 382 S.E.2d at 553–55. Accordingly, the lack of court approval does not negate the obligation of the State to refrain from relying upon evidence secured through Appellant's grant of immunity.

**29.** Apparently, the special prosecutor and the lead investigator, Sergeant Alkire, were unaware of the immunity agreement until after Appellant's statements to the Florida authorities had been read to the grand jury.

Circuit Court of Appeals in *United States v. Harris*, 973 F.2d 333 (4th Cir.1992):

> When the government decides to prosecute a previously use-immunized witness, the district court must hold a so-called *Kastigar* hearing to allow the government the opportunity to demonstrate that all of its evidence came from sources independent of the compelled testimony. The government bears 'the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.' Courts have interpreted this passage to require the government to make its proof by a preponderance of the evidence. It is not legitimate for the government to alter its investigatory strategy as a result of the immunized statement. As the Court stated in *Kastigar*, 'This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.'

973 F.2d at 336–37 (citations omitted).

The State maintains that Appellant's conviction was obtained solely through the testimony of Lewis and Walton and with no reliance on any immunized statements made by Appellant. However, as the court in *Harris* recognized, the State's representations that no immunity violation occurred do not take the place of a *Kastigar* hearing. *See Harris*, 973 F.2d at 337 ("government's mere representations to this effect standing alone are generally insufficient to carry its burden"). Moreover, the State, like the trial court, focuses solely on statements made by Appellant, when it is clear from *Harris* that investigatory leads obtained from immunized testimony are also covered by the requirements of *Kastigar*.[30]  *See* 973 F.2d at 336–37.[31]

The State argues that "the failure to grant a *Kastigar* hearing is harmless where it is otherwise evident that any immunized evidence admitted at trial did not prejudice the accused." This statement, however, amounts to an erroneous statement of the harmless error rule as it relates to the *Kastigar* hearing requirement. After the *Kastigar* hearing has been held, "[d]ismissal of the indictment or vacation of the conviction is not necessary where the use is found to be harmless beyond a reasonable doubt." *United States v. North*, 910 F.2d 843, 854, *opinion withdrawn and superceded in part on other grounds*, 920 F.2d 940 (D.C.Cir. 1990), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991) (citing, inter alia, *United States v. Gregory*, 730 F.2d 692 (11th Cir.1984)). Thus, any determination of harmless error can only be found *after* a *Kastigar* proceeding has been held. *See North*, 910 F.2d at 854. Accordingly, the State's arguments regarding harmless error are premature at this juncture.

We conclude that when a previously immunized witness is prosecuted, a hearing must be held pursuant to *Kastigar* for the purpose of requiring the State to demonstrate by a preponderance that all of the evidence it proposes to use was derived from legitimate sources wholly independent of the immunized testimony. *See* 406 U.S. at 460, 92 S.Ct. at 1664–65. While such a hearing should usually be held at the pretrial stage, it may, under the facts of the case, be properly held post-trial or mid-trial or at some combination of these trial stages, as pertinent evidence is offered. *See North*, 910 F.2d at 854.

Based on the trial court's failure to hold a *Kastigar* hearing, remand is necessary for the limited purpose of allowing the State the opportunity to prove that the evidence used to indict and convict Appellant was derived

---

**30.** Sergeant Alkire testified that it was possible that Appellant supplied investigative leads regarding Christina Cook, Palmer Atkinson, and Bill McCoy. In further support of the possibility that the State relied on his statements to obtain investigatory leads, Appellant notes that on the same day he signed the immunity agreement, he was subjected to two polygraph tests by state investigators.

**31.** Appellant argues that alibi information contained in his statement to the Florida authorities upon his arrest was wrongly used to indict and to convict him. We do not address whether such statement would be outside the parameters of the immunity agreement.

from legitimate sources wholly independent of his immunized testimony. If the State meets its burden, then Appellant's conviction stands. Upon the failure of the State to make such a showing, however, the indictment must either be dismissed or a new trial awarded, unless the error is determined to be harmless beyond a reasonable doubt. *See United States v. Poindexter,* 951 F.2d 369, 377 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992); *North,* 910 F.2d at 854; *Gregory,* 730 F.2d at 698.

### VIII. Hypnotically Tainted Evidence

■■■ Appellant moved during trial to exclude the testimony of "Pee Wee" Walton and Pamela Wilson on the grounds that such testimony had been tainted by hypnotic refreshment.[32] The trial court denied the motion as to Walton's testimony, but partially granted the request in connection with Wilson's testimony.[33] Appellant seeks a per se ruling that all hypnotically refreshed testimony must be excluded. Because the trial court only permitted the State to use the pre-hypnosis statement given by Wilson to Sergeant Alkire, Appellant lacks any basis for complaining about the taint of hypnosis with regard to this witness. The trial court's ruling is in accord with the prevailing view on this issue, which is to bar post-hypnotic, but to allow pre-hypnotic recollection. *See, e.g., State v. Baker,* 338 N.C. 526, 451 S.E.2d 574, 590–91 (1994); *State v. Cook,* 65 Ohio St.3d 516, 605 N.E.2d 70, 77–78 (1992); *Hopkins v. Commonwealth,* 230 Va. 280, 337 S.E.2d 264, 270–71 (1985), *cert. denied sub nom. Hopkins v. Virginia,* 475 U.S. 1098, 106 S.Ct. 1498, 89 L.Ed.2d 898 (1986).

The licensed psychologist who attempted to induce hypnosis on Walton testified that, at best, he "was able to put him in ... [a]

mild or low-level trance." He explained further that, "every time that I would put him into a trance, as soon as I would get to anything that would be, I think, related to the offense, as far as meeting people or talking to people, ... he would come out of the trance...." The trial court concluded that Walton's memories were not induced by hypnosis. As the court in *United States v. Bourgeois,* 950 F.2d 980 (5th Cir.1992), recognized in upholding the trial court's refusal to limit testimony based on the taint of hypnosis,

> The district court's rulings were based on its factual finding that ... [the witness] was not hypnotized during her session with the hypnotist. In light of the evidence presented at the pretrial hearing, we cannot say that this factfinding is clearly erroneous.... [C]ertain procedural protections [are required] when the court admits hypnotically enhanced testimony, *but only when it is established that the witness was hypnotized.*

*Id.* at 985 (emphasis supplied). We find no error in the trial court's refusal to exclude Walton's testimony on the same grounds elicited in *Bourgeois.* Furthermore, we decline to adopt a per se ruling that all hypnotically refreshed testimony must be excluded.

### IX. Cumulative Error

■■■ Appellant's assertion of the cumulative error rule, as announced in *State v. Smith,* 156 W.Va. 385, 193 S.E.2d 550 (1972),[34] is ungrounded. Since the only error that occurred was the lack of a *Kastigar* hearing, the cumulative error rule has no application to this case.

Based on the foregoing, the decision of the Circuit Court of Pocahontas County is here-

---

**32.** They were hypnotized by a psychologist retained by the state police.

**33.** In response to Appellant's motion to exclude Wilson's testimony on grounds that her testimony was affected by hypnosis and further, based on the lack of record made by the hypnotist, the trial court limited the State in its case in chief to evidence and testimony in Wilson's statement that was given prior to hypnosis. In addition, the trial court gave Appellant the right to bring in any inconsistent statements made as a result

of the hypnosis and to question Wilson regarding the same.

**34.** The cumulative error rule provides that; "[w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." Syl. Pt. 5, *Smith,* 156 W.Va. at 385, 193 S.E.2d at 551–52.

by remanded for a *Kastigar* hearing. Following such hearing, an order to uphold Appellant's conviction, to dismiss the indictment against him, or to award a new trial shall be entered consistent with this opinion.

Remanded.

BROTHERTON and RECHT, JJ., did not participate.

MILLER, Retired J., sitting by temporary assignment.

FOX, Judge, sitting by temporary assignment.